MICHAEL S. AND MARILYN H. FALSETTI, ET AL.,[1]
PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket Nos. 7013–82, 5437–83,    Filed August 21, 1985.
5438–83, 7111–83,
20833–83.

*Thomas W. Harris, Jr.*, for the petitioners.
*Theodore Garelis*, for the respondent.

NIMS, *Judge*: Respondent determined the following deficiencies and additions to tax in petitioners' income taxes for the taxable years ending December 31:

---

[1]Cases of the following petitioners are consolidated herewith: Frank J. and Marsha L. Cuttone, docket No. 5437–83; Louis W. and Sandra M. Bittner, docket No. 5438–83; J. Neil and Helen Medefind, docket No. 7111–83; Monterey Pines Investors (also known as Monterey Pines Investors I), docket No. 20833–83.

| Case | Docket No. | Year | Deficiency | Additions to tax sec. 6651(a)[2] |
|------|-----------|------|-----------|------|
| Falsetti | 7013–82 | 1976 | $3,590 | |
| | | 1977 | 5,383 | |
| | | 1978 | 12,546 | |
| Cuttone | 5437–83 | 1976 | 1,925 | |
| | | 1977 | 16,013 | |
| Bittner | 5438–83 | 1976 | 2,335 | |
| | | 1977 | 12,420 | |
| Medefind | 7111–83 | 1974 | 3,404 | |
| | | 1976 | 5,337 | |
| | | 1977 | 9,885 | |
| Monterey Pines Investors | 20833–83 | 1976 | 14,250 | $3,563 |
| | | 1977 | 123,279 | 30,820 |

After concessions, the issues for decision are: (1) Whether Monterey Pines Investors was engaged in a bona fide business activity during 1976 and 1977; (2) the amount, if any, of depreciation expenses petitioners are entitled to claim; (3) whether petitioners are entitled to interest expense deductions; (4) whether petitioners are entitled to deduct certain legal expenses; (5) whether petitioner, Monterey Pines Investors, actually or constructively paid interest to a foreign corporation; (6) whether section 1461 (relating to "Liability for Withheld Tax") required Monterey Pines Investors to file a return and pay the tax imposed by section 1442 (relating to "Withholding of Tax on Foreign Corporations"); (7) whether a section 1442 tax of 30 percent of such interest payments should have been withheld at the source by Monterey Pines Investors; (8) and if so, whether Monterey Pines Investors is liable for the section 6651(a) addition to tax for the non-filing of Form 1042 (U.S. Annual Return of Income Tax to be Paid at Source) for the years 1976 and 1977; and (9) whether petitioners Michael and Marilyn Falsetti received constructive dividends from their wholly owned corporation, Mikomar, Inc., in the years 1977 and 1978.

[2]All section references are to the Internal Revenue Code of 1954 and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Certain facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference.

The following petitioners are individuals who resided in California at the time of filing of the petitions herein:

| Petitioners | Docket No. |
|---|---|
| Michael S. and Marilyn H. Falsetti (collectively Falsetti) | 7013–82 |
| Frank J. and Marsha L. Cuttone (collectively Cuttone) | 5437–83 |
| Louis W. and Sandra M. Bittner (collectively Bittner) | 5438–83 |
| J. Neil and Helen Medefind (collectively Medefind) | 7111–83 |

Petitioner Monterey Pines Investors (also known as Monterey Pines Investors I, a California limited partnership, hereinafter referred to as Monterey Pines Investors), is a California limited partnership with its principal place of business in California.

### Monterey Pines Investors

Monterey Pines Investors was formed in March 1977, with Lloyd V. Biggs (Biggs) as the general partner and the individual petitioners (as well as others who are not petitioners in this case) as limited partners. The Certificate of Limited Partnership was signed on behalf of the limited partners by Biggs on March 15, 1977, and was recorded in the official records of Fresno County, California, on March 16, 1977.

The individual petitioners contributed the following amounts of cash at the time of their investment in Monterey Pines Investors:

| | |
|---|---|
| Falsetti | $7,500 |
| Cuttone | 7,500 |
| Bittner | 7,500 |
| Medefind | 10,000 |

All individual petitioners made their contributions in December 1976.

Monterey Pines Apartments (the property) is an apartment complex located at 445 West Bullard Avenue, Fresno, Califor-

nia. Prior to October 21, 1976, the property was owned jointly by Gardner Motors, Inc., Sunnyside Volkswagen, Inc., and Fresno Economy Import Used Cars (collectively referred to as the Gardner Group). The fair market value of the property on November 1, 1976, was no greater than $1,960,000.

In May 1976, the Gardner Group entered into negotiations to sell the property to G & G Investors for $1,880,000. G & G Investors is a California limited partnership with Daniel Grayson, Richard A. Denman, and John E. Sims as general partners. A proposed purchase price of $1,869,500 was also seriously discussed as late as September 1976. The sale of the property to G & G Investors was never consummated.

On October 21, 1976, Thomas W. Harris, Jr. (Harris), and Donald L. Jackson formed a general partnership called Jackson-Harris, Monterey Pines Investors (hereinafter Jackson-Harris). One or both of the partners in Jackson-Harris borrowed $250,000 from the Bank of America (the Bank of America loan). The proceeds of this loan were contributed to Jackson-Harris as the capital contribution of one or both of the partners.

On October 21, 1976, the Gardner Group sold the property to Jackson-Harris for $1,880,000. The Bank of America loan proceeds were used as a downpayment on the Agreement of Purchase and Sale Land Contract to acquire the property. Harris located the property and negotiated the terms of purchase on behalf of Jackson-Harris. Jackson-Harris, the Gardner Group and G & G Investors were all unrelated parties, and negotiations were conducted at arm's length.

The Agreement of Purchase and Sale Land Contract provides for the payment of the purchase price as follows:

2. *Purchase Price.* Vendor agrees to sell, and Vendee agrees to buy the Project for the sum of ONE MILLION EIGHT HUNDRED AND EIGHTY THOUSAND DOLLARS ($1,880,000.00) (hereinafter "Purchase Price") lawful money of the United States, which shall be payable or evidenced as follows:

(a) The sum of TWO HUNDRED FORTY-FOUR THOUSAND AND FOUR HUNDRED DOLLARS ($244,400.00) hereinafter "Down Payment") in the form of cash, cashier's check or certified check through and at close of TITLE INSURANCE AND TRUST Escrow Number 241701-T.

(b) The sum ONE MILLION SIX HUNDRED THIRTY-FIVE THOUSAND SIX HUNDRED DOLLARS ($1,635,600.00) (hereinafter "Balance of Purchase Price") as follows:

(1) The sum of ELEVEN THOUSAND NINE HUNDRED NINETY-FOUR AND 40/100 DOLLARS ($11,994.40) in monthly installments beginning December 1, 1976 and on the first (1st) day of each and every month thereafter for sixty (60) consecutive calendar months. Said sum represents interest only at eight and eight-tenths percent (8.8%) per annum on the principal balance of ONE MILLION SIX HUNDRED THIRTY-FIVE THOUSAND SIX HUNDRED DOLLARS ($1,635,600.00); and

(2) The full amount of the balance of the Purchase Price shall be paid on or before November 1, 1981 or by that date the Underlying Note (as hereinafter described) shall be assumed and the difference between the principal amount of that note and the Purchase Price shall be paid to Vendor. Vendee will assume liability for the commission to be paid to GERALD R. RODDER or nominee.

(c) In addition to the monthly payment as hereinabove provided, Vendee assumes and agrees to pay before delinquency all real property taxes and assessments, and Vendee shall reserve each month during the term of this Agreement a sum equal to one-twelfth (1/12th) of the amount of real property taxes assessed and levied against the Project (hereinafter "Impounds") which sum shall be paid as hereinafter provided. Said Impounds shall all be computed on the basis of the most recent tax bill available and shall be adjusted periodically to maintain an adequate reserve account for the timely payment of real property taxes.

Jackson-Harris and the Gardner Group executed a Memorandum of Agreement evidencing the October 21, 1976, sale of the property simultaneously with the Agreement to Purchase and Sale Land Contract. The Memorandum of Agreement was duly recorded on the same date.

On October 25, 1976, Jackson-Harris executed a document entitled "Agreement of Purchase and Sale Land Contract" for the sale of the property to an entity known as World Realty Systems, Inc., a Cayman Islands corporation (also known as World Realty, Inc., hereinafter World Realty). World Realty is a foreign corporation owned by George Kuchulis (Kuchulis). The stated purchase price under the agreement was $2,180,000. The document in question contains no evidence of recordation, nor is any Memorandum of Agreement showing recordation in evidence.

Harris represented both parties to the October 25, 1976, transaction and executed the agreement by signing for both parties. He signed for World Realty as "Attorney in Fact." Harris' power of attorney authorizing him to sign for World Realty is not in evidence. The stated purchase price of $2,180,000 and all other terms of the agreement were unilaterally set by Harris. Harris did not communicate with Kuchulis,

World Realty, or World Realty's Cayman Island attorney at any time before or after the transaction.

Specifically, in connection with the sale to World Realty, Harris never informed anyone connected with World Realty that: (1) Jackson-Harris was interested in selling the property; (2) Harris owned a 50-percent interest in the property as a partner in Jackson-Harris; (3) the property had been purchased 4 days earlier by Jackson-Harris for $1,880,000; (4) Harris executed the purchase agreement and sale land contract on behalf of World Realty; or that (5) the stated purchase price was $2,180,000 and subject to the terms as delineated in the agreement. Subsequently, Harris never informed anyone connected with World Realty that the property was sold to Monterey Pines Investors by Harris on behalf of World Realty for $2,850,000 and subject to the terms of a November 1, 1976, agreement of purchase and sale land contract between World Realty and Monterey Pines Investors dated November 1, 1976.

There were no appraisals done by either Jackson-Harris or World Realty relating to the fair market value of the property on or before October 25, 1976. World Realty has never held legal title to the property. Title insurance was never obtained on the property either by World Realty or on its behalf.

The October 25, 1976, Agreement of Purchase and Sale Land contract provides for the payment of the purchase price as follows:

2. *Purchase Price.* Vendor agrees to sell, and Vendee agrees to buy the Project for the sum of TWO MILLION ONE HUNDRED EIGHTY THOUSAND DOLLARS ($2,180,000.00) (hereinafter "Purchase Price") lawful money of the United States, which shall be payable or evidenced as follows:

(a) Vendee shall take subject to encumbrances specified in that Agreement of Purchase and Sale Land Contract dated October 21, 1976 by and between GARDNER MOTORS, INC., et al and MONTEREY PINES INVESTORS, a California General Partnership.

(b) Vendee shall make such payments as are necessary to allow Vendor to repay loan of Two hundred fifty thousand dollars ($250,000.00) to Bank of America, National Trust and Savings Association, Selma Branch on such terms and conditions as from time to time are satisfactory to the bank.

(c) The balance of the purchase price of Three hundred thousand dollars ($300,000.00) shall be payable to Vendor on a Ten (10) year installment payment at five percent (5%) interest with no principal reductions during the first Five (5) years with principal being reduced in Sixty (60) equal monthly installments starting January 1, 1982 with interest on unpaid

balance at Ten percent (10%). Interest accrues until November 1, 1979 and is payable monthly thereafter.

(d) With regard to all other terms and conditions, Vendee takes subject to and shall be bound by the Purchase and Sale Land Contract by which Vendor took title described in detail above and attached hereto as Exhibit "A."

On November 1, 1976, Harris executed a document on behalf of World Realty entitled "Agreement of Purchase and Sale Land Contract" for the sale of the property by World Realty to Monterey Pines Investors. Biggs executed the document on behalf of Monterey Pines Investors as the general partner. The document in question bears no evidence of recordation, nor is any Memorandum of Agreement showing recordation in evidence.

Harris and Biggs were related both personally and professionally. Biggs was the brother-in-law of Harris' brother-in-law. Biggs worked for and subsequently became part owner of a management company known as Calamity Corp. Calamity Corp. was at one time wholly owned by Harris. Harris sold all of his stock in Calamity Corp. to Biggs and an individual named Weersing (Harris' father-in-law) in equal amounts. Thereafter, Harris paid fees to Calamity Corp. to manage certain real estate projects.

Harris unilaterally set the terms of the November 1, 1976, transaction, including the purchase price of $2,850,000. There were no appraisals of the property made in connection with the transaction of November 1, 1976. Monterey Pines Investors never held title to the property nor was title insurance on the property ever obtained by or on behalf of Monterey Pines Investors.

The November 1, 1976, Agreement of Purchase and Sale Land Contract between World Realty, as vendor, and Monterey Pines Investors, as vendee, contains the following provisions:

2. *Purchase Price.* Vendor agrees to sell, and Vendee agrees to buy the Project for the sum of TWO MILLION EIGHT HUNDRED AND FIFTY THOUSAND DOLLARS ($2,850,000.00) (hereinafter "Purchase Price") lawful money of the United States, which shall be payable or evidenced as follows:

(a) The sum of FORTY-SEVEN THOUSAND FIVE HUNDRED DOLLARS ($47,500.00) to be paid in cash prior to December 31, 1976 as interest at ten

percent (10%) per annum simple interest for the period from November 1, 1976 through December 31, 1976; and,

(b) Interest only shall be payable monthly from and after January 1, 1977 at the rate of ten percent (10%) per annum, which is TWENTY THREE THOUSAND SEVEN HUNDRED FIFTY and no/100 DOLLARS ($23,750.00).

(c) On or about November 1, 1981 Vendee shall make a principal payment to Vendor sufficient for Vendor to make the payment on its underlying contract of sale.

(d) In addition to the monthly payment as hereinabove provided, Vendee assumes and agrees to pay before delinquency all real property taxes and assessments, and Vendee shall reserve each month during the term of this Agreement a sum equal to one-twelfth ($\frac{1}{12}$th) of the amount of real property taxes assessed and levied against the Project (hereinafter "Impounds") which sum shall be paid as hereinafter provided. Said Impounds shall be computed on the basis of the most recent tax bill available and shall be adjusted periodically to maintain an adequate reserve account for the timely payment of real property taxes.

Books of account relative to the property transactions at issue here were maintained by Harris for both Jackson-Harris and Monterey Pines Investors. The following journal entries were recorded in the Jackson-Harris books to reflect the acquisition of the property by Jackson-Harris from the Gardner Group on October 21, 1976:

| Item | Debits | Credits |
|---|---|---|
| Impound account | $13,122.84 | |
| Land and building | 1,880,330.00 | |
| Deposits | 14,631.53 | |
| | | |
| Contract payable | | $1,635,600.00 |
| Property tax | | 13,122.84 |
| Security deposit | | 8,145.33 |
| Prepaid rents | | 1,216.20 |
| Capital | | 250,000.00 |

To record the purchase of the
Monterey Pines complex on 10/21/76

The following journal entries were recorded in the Jackson-Harris books to reflect the purported sale of the property by Jackson Harris to World Realty on October 25, 1976:

| Item | Debits | Credits |
|---|---|---|
| Receivable from World Realty Systems, Inc. | $3,761.31 | |
| Drawings | 0 | |

| Item | Debits | Credits |
|---|---|---|
| Security deposits | $8,145.33 | |
| Prepaid rents | 1,216.20 | |
| Note receivable-World Realty Systems, Inc. | 2,180,000.00 | |
| Impound account | | $13,122.84 |
| Land and building | | 1,880,330.00 |
| Deferred gain | | 299,670.00 |

To record the sale of Monterey Pines
to World Realty Systems, Inc. on 10/25/76

To reflect the acquisition of the property from World Realty by Monterey Pines Investors, an accounting entry in the books and records was made crediting a liability account (hereinafter note payable, World Realty) in the amount of $2,850,000. Monterey Pines Investors did not make payments directly to World Realty and World Realty did not make payments directly to Jackson-Harris.

Monterey Pines Investors made the following payments during the calendar year 1977:

| Check No. | Payee | Amount | Date |
|---|---|---|---|
| 147 | Bank of America | $11,994.40 | 1/17/77 |
| 192 | Bank of America | 11,994.40 | 2/25/77 |
| 102 | Bank of America | 10,000.00 | 3/ 7/77 |
| 107 | Bank of America | 11,994.40 | 3/10/77 |
| 131 | Bank of America | 15,000.00 | 4/ 8/77 |
| 134 | Bank of America | 11,994.40 | 4/12/77 |
| 156 | Bank of America | 11,994.40 | 5/12/77 |
| 197 | Bank of America | 11,994.00 | 6/10/77 |
| 228 | Monterey Pines | 11,994.00 | 7/12/77 |
| 250 | Bank of America | 241,996.87 | 8/ 4/77 |
| 256 | Monterey Pines | 11,994.00 | 8/12/77 |
| 300 | Monterey Pines | 11,994.40 | 9/12/77 |
| 334 | Monterey Pines | 11,994.40 | 10/11/77 |
| 361 | Monterey Pines Apartments | ·11,994.40 | 11/14/77 |
| 389 | Monterey Pines Apartments | 11,994.40 | 12/11/77 |
| Total, 1977 | | [3]410,929.67 | |

[3]The total stipulated, $410,929.67, reflects monthly payments of $11,994.40 (the monthly amounts due from Jackson-Harris to the Gardner Group), whereas the checks dated 6/10/77, 7/12/77, and 8/12/77 reflect payments of only $11,994.00 each. For convenience, we have used the $410,929.67 stipulated figure throughout this opinion, although the correct total is $410,928.47 ($1.20 less than the total stipulated).

Monterey Pines Investors recorded on its books of account for 1977 the above payments as follows:

|  | Cumulative debits | Cumulative credits |
|---|---|---|
| Note payable, World Realty | $250,000.00 | |
| Interest expense | 160,929.67 | |
| Cash | | $410,929.67 |

On December 31, 1977, an adjusting journal entry was made which increased the note payable, World Realty account and increased the interest expense account as follows:

|  | Debit | Credit |
|---|---|---|
| Interest expense | $65,053.53 | |
| Note payable, World Realty | | $65,053.53 |

The payments made by Monterey Pines Investors were treated by Monterey Pines Investors and Jackson-Harris as if said amounts had been paid to World Realty by Monterey Pines Investors, followed by the payment of said amounts to Jackson-Harris by World Realty. Monterey Pines Investors deducted interest expenses of $233,333 on its 1977 partnership return, of which $225,983 was attributable to the $410,929.67 in payments set forth above. On its 1977 partnership return, Jackson-Harris reported interest income from World Realty of $114,625 and a reduction in the amount due to it from World Realty of $296,305. Jackson-Harris also deducted interest expenses of $143,933 in the same year.

Jackson-Harris originally made entries on its books and records reflecting receipt of interest income of $217,650.56 from World Realty and a reduction in the amount of principal due from World Realty of $193,279.11. Daniel Sugimoto, the C.P.A. who prepared the 1977 Jackson-Harris partnership return, prepared a return in accordance with the original book entries but subsequently changed the return after showing it to Harris. Sometime after October 1978, the books and records of Jackson-Harris were changed to reflect interest income of $114,624.70 for 1977.

On August 4, 1977, Biggs, as general partner of Monterey Pines Investors, executed a Deed of Trust and Assignment of Rents on the property for the purpose of securing a promissory note in the amount of $275,000 from Jackson-Harris to

Warren E. and Melda Johnson. On June 15, 1978, Biggs, Harris, and Gary G. Bagdasarian (Bagdasarian) (Harris' law partner), on behalf of Jackson-Harris, executed a Deed of Trust and Assignment of Rents as security for a promissory note in the amount of $300,000 from Jackson-Harris to Valley Radiology Medical Group, Inc. Pension and Profit Sharing Trust. On July 6, 1978, Biggs, as general partner of Monterey Pines Investors, executed another Deed of Trust and Assignment of Rents on the Property as security for a promissory note in the amount of $400,000 from Jackson-Harris to Union Bank of Bavaria. On October 26, 1978, Harris, as general partner of Jackson-Harris, executed a Deed of Trust and Assignment of Rents to secure a subsequent promissory note in the amount of $400,000 from Jackson-Harris to Union Bank of Bavaria.

The proceeds of the promissory notes secured by the June 15, 1978, July 6, 1978, and October 26, 1978, Deeds of Trust and Assignment of Rents inured to the benefit of Harris or Bagdasarian, or both. In all four Deeds of Trust and Assignment of Rents, the address of the trustor (debtor) was the same as the Harris and Bagdasarian law corporation. On July 24, 1978, both Harris and Bagdasarian acknowledged and accepted the terms of the July 5, 1978, loan.

In early 1979, petitioners Falsetti transferred their partnership interest in Monterey Pines Investors to Donald Ward Ozenbaugh, Jr., and Kathryn Ozenbaugh (collectively Ozenbaugh) in exchange for a promissory note in the amount of $7,500 plus 10 percent interest per annum on the principal amount. On March 31, 1979, Ozenbaugh transferred the partnership interest in Monterey Pines Investors acquired from Falsetti to Constellation Properties, Ltd.

Constellation Properties, Ltd. (Constellation) is a corporation wholly owned by Harris. Harris is the president of Constellation. During 1979 and 1980, petitioners Medefind, Cuttone, and Bittner transferred their partnership interests in Monterey Pines Investors to Constellation and/or Harris in exchange for promissory notes in the respective amounts of $53,500, $20,062.50, and $20,062.50. The amounts of the notes represent the partners' capital contributions to the partnership plus 10-percent simple interest per annum on the amounts of the capital contributions from the dates of contri-

bution to the dates their partnership interests were transferred.

Petitioners Falsetti, Cuttone, and Bittner were advised to sell their partnership interests for the above-mentioned terms by Ozenbaugh. Petitioner Medefind was approached by Harris with an offer to purchase Medefind's partnership interests for the terms as specified.

On September 19, 1980, Monterey Pines Partners of Fresno (Monterey Pines Partners) purchased the property for 4,001,000 from Harris. Monterey Pines Partners was a California limited partnership set up by Ozenbaugh. Ozenbaugh was the general partner. Subsequent to the purchase, Monterey Pines Partners leased the property back to Harris.

On July 1, 1983, the property was sold to Fidelity Equities Corp. (Fidelity) by Jackson-Harris for $3,250,000. The agreement of sale was executed by Harris as general partner. At the time of the sale to Fidelity, the Gardner Group grant-deeded the property to Jackson-Harris; Jackson-Harris grant-deeded the property to Monterey Pines Partners; and Monterey Pines Partners grant-deeded the property to Fidelity. The interests of Monterey Pines Investors and World Realty were ignored by the parties at the time of sale of the property to Fidelity.

*Constructive Dividends*

Petitioners Michael and Marilyn Falsetti (the Falsettis) purchased the building, inventory, and equipment of Farnesi's Restaurant in Chowchilla, California, in January 1976. Petitioners operated the restaurant as a sole proprietorship until August 3, 1976, when the business was incorporated under the name of Mikomar, Inc. (Mikomar). The inventory and equipment of Farnesi's Restaurant was transferred to Mikomar. Mikomar was formed as a California corporation and was wholly owned by the Falsettis. All corporate offices of Mikomar were held by the Falsettis.

Mikomar deducted the following expenses which it paid during the fiscal years ending October 31, 1977, and October 31, 1978, respectively:

|  | FYE 10/31/77 | FYE 10/31/78 |
|---|---|---|
| Auto expenses | $6,417 | $13,978 |
| Travel expenses | 2,639 | 526 |
| Boat expense | 2,409 | 2,467 |

|                              | FYE 10/31/77 | FYE 10/31/78 |
|------------------------------|:------------:|:------------:|
| Health and life insurance    | $373         | - - -        |
| Unidentified/unknown         | 1,264        | $2,497       |
| Total                        | 13,102       | 19,468       |

A statutory notice of deficiency was issued to Mikomar disallowing all of the above deductions based on respondent's determination that they were personal expenses of the Falsettis and therefore constituted constructive dividends. Mikomar failed to petition the Tax Court, and the amounts asserted in the deficiency notice were assessed. The record contains no indication that Mikomar filed refund claims.

Mikomar paid and deducted auto expenses for the years at issue as follows:

|                                | FYE 10/31/77 | FYE 10/31/78 |
|--------------------------------|:------------:|:------------:|
| Auto expense for year          | $2,347       | $2,827       |
| Blazer depreciation            | 2,667        | 2,667        |
| Blazer hitch depreciation      | 60           | 60           |
| Blazer radio depreciation      | 74           | 74           |
| Pantera depreciation           | 968          |              |
| Mark V depreciation (3-DDB)    |              | 8,272        |
| Repairs                        | 135          |              |
| DMV license                    | 96           | 78           |
| Insurance                      | 70           |              |
| Total                          | 6,417        | 13,978       |

The Falsettis have conceded that the Pantera and Continental Mark V automobiles were used for personal and not business use.

The Falsettis used the Blazer to pick up wine for the restaurant 1 to 3 times a month from Sangor, California, which is approximately 50 to 60 miles from the restaurant. The Falsettis drove to Fresno, which is approximately 40 miles from the restaurant, to pick up supplies for the restaurant. However, they failed to keep any records as to any business use of the Blazer. The Blazer was also used to tow the Falsettis' boats to various recreational lakes in California when the Falsettis were on vacation, and by them to commute between their home and the restaurant.

Mikomar paid and deducted travel expenses during the years at issue as follows:

|                        | FYE 10/31/77 | FYE 10/31/78 |
| ---------------------- | ------------ | ------------ |
| Damaler Travel Agents  | $336         | $526         |
| April Point Travel     | 961          |              |
| Baskford Travel Agents | 1,342        |              |
| Total                  | 2,639        | 526          |

During the years at issue, the Falsettis went to Canada by commercial airline to visit Mr. Falsetti's grandparents. The airline tickets were obtained through Baskford Travel Agents. While in Canada, the Falsettis stayed at the April Point Lodge. They failed to present any evidence of a business purpose for the amounts paid to Damaler Travel Agents, April Point Travel, or Baskford Travel Agents.

Mikomar paid and deducted boat expenses during the years at issue as follows:

|                             | FYE 10/31/77 | FYE 10/31/78 |
| --------------------------- | ------------ | ------------ |
| Boat depreciation           | $1,500       | $2,083       |
| Centurion boat depreciation |              | 250          |
| Prudential Insurance        | 174          |              |
| McClure Pt. Marine          | 175          |              |
| Cecil's Marine              | 183          |              |
| Prudential                  | 139          |              |
| Newfield                    | 115          |              |
| Madera Marine               |              | 134          |
| Total                       | [4]2,286     | 2,467        |

The Falsettis used the boats for personal purposes. No records of any business use were ever maintained.

Health and life insurance payments paid and deducted by Mikomar during its fiscal year ended October 31, 1977, were as follows:

Health insurance ................................. $344
Life insurance ..................................... 29
Total ......................................... 373

Michael Falsetti was the only insured party in both policies.

Unidentified expenses paid and deducted by Mikomar during the years at issue were as follows:

---

[4]The parties stipulated, without explanation, total boat expenses of $2,409 for the 10/31/77 fiscal year. The correct total of the items stipulated is $2,286.

|  | FYE 10/31/77 | FYE 10/31/78 |
|---|---|---|
| Mr. and Mrs. J. McHaley | $1,000 | |
| Van Del, Inc. | 264 | |
| Farmers and Prudential Insurance | | $2,497 |
| Total | 1,264 | 2,497 |

OPINION

*Monterey Pines Investors*

Jackson-Harris, a California general partnership, purchased Monterey Pines Apartments on October 21, 1976, for $1,880,000 from the Gardner Group by way of an Agreement of Purchase and Sale Land Contract. On October 25, 1976, Jackson-Harris sold the property to World Realty (a Cayman Islands corporation) for $2,180,000, also by way of an Agreement of Purchase and Sale Land Contract. World Realty then sold the property to Monterey Pines Investors, a California limited partnership, on November 1, 1976, for $2,850,000, again by way of an Agreement of Purchase and Sale Land Contract.

The individual petitioners herein were all limited partners of Monterey Pines Investors during the years in issue. Sometime in 1979 and 1980, petitioners sold their interests in Monterey Pines Investors to Harris or Constellation Properties, Ltd. (wholly owned by Harris), for amounts equal to their cash contributions in Monterey Pines Investors plus 10-percent simple interest per annum.

The property was then sold in 1980 to Monterey Pines Partners, a California limited partnership, for $4,001,000 by way of an Agreement of Purchase and Sale Land Contract. The property was then leased back to Harris. On July 1, 1983, the property was sold to Fidelity Equities Corp. by Jackson-Harris for $3,250,000. At the time of the sale to Fidelity, legal title was transferred from the Gardner Group to Fidelity as follows: Gardner Group grant-deeded the property to Jackson-Harris, which grant-deeded the property to Monterey Pines Partners, which grant-deeded the property to Fidelity.

The first issue for decision is whether Monterey Pines Investors was engaged in a bona fide business activity during the years 1976 and 1977. Resolution of this issue is dependent

upon a determination of whether Monterey Pines Investors ever acquired an interest in the property.

Petitioners contend that Monterey Pines Investors was in the business of investing in real estate. In accordance with the nature of its business, Monterey Pines Investors "purchased" the property with the expectation that the property would appreciate and result in a gain to the partnership upon sale. To support their contention that Monterey Pines Investors purchased the property, petitioners argue that the Agreement of Purchase and Sale Land Contract between World Realty and Monterey Pines Investors was a legally enforceable and valid vehicle for conveying equitable ownership in real property and therefore not a sham.

Conversely, respondent contends that Monterey Pines Investors never obtained an interest in the property and therefore the partnership could not be considered as having engaged in a bona fide business activity. Respondent argues that the facts and circumstances surrounding the purported equitable transfer of the property demonstrate that the alleged transaction was nothing more than a culmination of a series of sham transactions devoid of economic substance. Respondent therefore concludes that Monterey Pines Investors never acquired an interest in the property which would entitle the individual petitioners to any distributive share of deductions.

After reviewing the record before us, we are convinced that respondent is correct. This is because we have concluded that the purported sale transaction between World Realty and Monterey Pines Investors was in substance a sham. It follows from this that Monterey Pines Investors was not engaged in a bona fide business activity during the years at issue.

Before we give our reasons, we deem it advisable to set forth a working definition of what constitutes a sham in substance, basing our definition upon the rationale of such cases as *Knetsch v. United States*, 364 U.S. 361 (1960), and its progeny, and dictum in *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978). For purposes of this case, we define "sham in substance" as the expedient of drawing up papers to characterize transactions contrary to objective economic realities and which have no economic significance beyond expected tax benefits. See 435 U.S. at 572.

In the context of a sale transaction, as here, our task is to determine whether the parties have in fact done what the form of their arrangement purports to do. *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1237 (1981). In other words, we must determine whether World Realty, in fact, sold the property to Monterey Pines Investors.

The term "sale" is given its ordinary meaning for Federal income tax purposes and is generally defined as a transfer of property for money or a promise to pay money. *Commissioner v. Brown*, 380 U.S. 563, 570-571 (1965). In deciding whether a particular transaction constitutes a sale, the question of whether the benefits and burdens of ownership have passed from seller to buyer must be answered. This is a question of fact which must be ascertained from the intention of the parties as evidenced by the written agreements read in light of the attendant facts and circumstances. *Haggard v. Commissioner*, 24 T.C. 1124, 1129 (1955), affd. 241 F.2d 288 (9th Cir. 1956).

Various factors which have been considered by courts in making a determination as to whether a sale occurs were summarized in *Grodt & McKay Realty, Inc. v. Commissioner, supra,* as follows:

(1) Whether legal title passes; (2) how the parties treat the transaction; (3) whether an equity was acquired in the property; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage to the property; and (8) which party receives the profits from the operation and sale of the property. [77 T.C. at 1237–1238; citations omitted.]

An additional factor not listed but nonetheless relevant to the facts of this case is the presence or absence of arm's-length dealing. *Estate of Franklin v. Commissioner*, 64 T.C. 752 (1975), affd. 544 F.2d 1045 (9th Cir. 1976). With these factors in mind and cognizant of the fact that the totality of the facts and circumstances surrounding the transaction is controlling, we conclude that the purported sale between World Realty and Monterey Pines Investors was a sham in substance and therefore Monterey Pines Investors never acquired an interest in the property.

At no time did legal title ever vest with Monterey Pines Investors. In fact, at the time the property was sold to Fidelity in 1983, the chain of grant deeds conspicuously ignores any interest of World Realty or Monterey Pines Investors. Moreover, neither the sale to World Realty by Jackson-Harris nor World Realty to Monterey Pines Investors was an arm's-length transaction; the stated purchase price to be paid by Monterey Pines Investors, as discussed *infra,* grossly exceeded the then fair market value of the property; and the parties themselves treated the transactions in a manner completely inconsistent with the supporting documents or with the notion that Monterey Pines Investors owned the property.

For reasons unexplained, the purchase and sale documents in the two pertinent transactions reflect an increase in the property's value of $970,000 in 10 days' time. In *Odend'hal v. Commissioner,* 80 T.C. 588, 612 (1983), affd. 748 F.2d 908 (4th Cir. 1984), we commented that "The doubling of the purchase price in such a back-to-back sale makes us question whether the second sales price reflects the fair market value, because there is nothing in the record to indicate how such a dramatic change could have occurred within a few weeks." Here, we question not only the "dramatic change" but the actuality of the sales, themselves.

Harris represented both parties to the October 25, 1976, transaction between Jackson-Harris and World Realty, and he unilaterally set the terms and conditions of the sale. Although Jackson-Harris acquired the property 4 days prior to the sale to World Realty, Harris set the purchase price at $2,180,000, or $300,000 more than what he had just paid. Moreover, Harris failed to inform anyone connected with World Realty that he had bought the property for World Realty or that he held a 50-percent interest in the partnership which was allegedly selling the property. Equally unrealistic is Harris' subsequent failure to notify World Realty that he was selling the property which he had just acquired for World Realty and that its gain in the span of 6 days would be $670,000.

Likewise, the purported sale on November 1, 1976, in which World Realty supposedly sold the property to Monterey Pines Investors was not an arm's-length transaction between unrelated parties. Harris represented World Realty, and Biggs, as general partner, represented Monterey Pines Investors. At the

time of the sale, Monterey Pines Investors had no limited partners nor any capital contributions. The individual petitioners did not make capital contributions until more than a month after the purchase and sale transaction. Biggs was a relative by marriage and professionally associated with Harris. Biggs, and Harris' father-in-law, Weersing, were half owners of Calamity Corp. which previously had been wholly owned by Harris and had been sold by Harris to Biggs and Weersing. Calamity Corp. was paid fees by Harris to manage certain real estate ventures of Harris.

The terms and conditions of the alleged sale to Monterey Pines Investors were again unilaterally set by Harris. On this point, Harris testified as follows:[5]

Q. How was the $2,850,000 price in regard to the November 1st transaction, determined?
A. I can't recall if there was a formula or anything, but I set the price.
Q. Unilaterally?
A. Yes.
Well, I shouldn't say yes. I sat down and discussed it with Mr. Biggs at the time, so I—in that case I would have to say no. Not unilaterally.
But I had the final authority to say yes or no to any terms, so that is why I say technically yes.

We deem this to be an admission by Harris that he alone determined the purchase price. In sum, based on Harris' familial and professional relationship with Biggs as well as Harris' own testimony, we conclude that the alleged November 1, 1976, transaction was not at arm's length.

Further doubt as to the bona fides of the transaction is raised by the drastically inflated sales price. We have found as a fact that the fair market value of the property at the time of the sale to Monterey Pines Investors on November 1, 1976, was no greater than $1,960,000. That finding comports not only with the valuation by respondent's expert witness, which was unrefuted by petitioners, but also with the purchase price of $1,880,000 paid by Jackson-Harris to the Gardner Group on October 21, 1976, and the $1,869,500 purchase price being seriously negotiated between G & G Investors and the Gardner Group prior to the sale by it of the property to Jackson-Harris.

---

[5]In addition to orchestrating the entire tax shelter scheme and benefiting financially from it, Harris was counsel for all petitioners in this case. He was called as a witness at the trial by respondent.

Nevertheless, petitioners would have us believe that the property which Jackson-Harris purchased in an arm's-length transaction on October 21, 1976, for $1,880,000, was in fact worth $2,850,000 ten days later. There is nothing in the record to indicate how such a dramatic change could have occurred in 10 days' time.

In *Ambassador Apartments, Inc. v. Commissioner*, 50 T.C. 236, 243 (1968), affd. 406 F.2d 288 (2d Cir. 1969), we characterized as "dramatic" a 26-percent increase in the value of an apartment building and land over the period of year. Surely, a 65-percent increase over a span of 10 days is even more dramatic, and on these facts, lacking any semblance of reality. See *Odend'hal v. Commissioner*, 80 T.C. at 612; *Thompson v. Commissioner*, 66 T.C. 1024, 1051 (1976), affd. 631 F.2d 642 (9th Cir. 1980). As we stated in *Grodt & McKay Realty, Inc., supra*:

Since a normal attribute of a true arm's-length sale is a purchase price at least approximately equal to fair market value, the totally disproportionate purchase price in this instance strongly militates against petitioners' contention that a true sale has taken place. [77 T.C. at 1240–1241; citations omitted.]

Equally detrimental to petitioners' contention that a sale took place between World Realty and Monterey Pines Investors is the treatment of the transaction by the parties completely inconsistent with any hypothesis that Monterey Pines Investors actually owned the property. The record establishes that between October 21, 1976, when Jackson-Harris purchased the property, and July 1983, when the property was sold to Fidelity, Jackson-Harris or Harris himself controlled and used the property at will and for his own benefit.

The property served as collateral for several loans to either Jackson-Harris or Harris, Bagdasarian (Harris' law partner), or both. On June 15, 1978, Valley Radiology Medical Group, Inc. Pension and Profit Sharing Trust loaned $300,000 to a party other than Monterey Pines Investors, taking the property as security. On July 6, 1978, and again on October 26, 1978, the Union Bank of Bavaria loaned $400,000 secured by the property. The proceeds from each of these loans inured to the benefit of Jackson-Harris or Harris, Bagdasarian, or both. Thus, despite petitioners' contention that the property was

owned by Monterey Pines Investors in 1978, Harris and his colleagues, and not Monterey Pines Investors, were using the property to secure loans. In this connection, it is noteworthy that only Jackson-Harris ever obtained title insurance on the property.

In 1979 and 1980, the individual petitioners were "cashed out" at an amount equal to their capital contributions plus 10 percent per annum simple interest. No appraisals were made at the time to determine the value of the investors' interests. Rather, the individual petitioners were cashed out at the urging of Ozenbaugh or Harris, for the terms as specified.

Subsequently, Monterey Pines Partners, whose general partner was Ozenbaugh, allegedly purchased the property for $4,001,000 and immediately leased it back to Harris. When the property was sold to Fidelity in 1983, the contract of sale was executed by Fidelity and Jackson-Harris. And as noted earlier, the chain of grant-deeds necessary to transfer legal title completely ignored any interest held by World Realty or Monterey Pines Investors.

Of final significance with respect to the treatment of the transaction by the parties thereto is the complete disregard of the terms of the Purchase and Sale Land Contract. The November 1, 1976, agreement states that during 1977, interest only in the amount of $23,750 per month ($285,000 per year) would be paid to World Realty. However, no cash was ever paid to World Realty by Monterey Pines Investors. Instead, Monterey Pines Investors made payments of $410,929.67 during 1977 to cover the obligations owed by Jackson-Harris to the Bank of America and the Gardner Group. The amount was not only more than that required to be paid by the November 1, 1976, agreement, but instead equaled the $266,997 owed to the Bank of America and the $143,932.80 ($11,994.40 per month) owed to the Gardner Group by Jackson-Harris.

The apportionment of the payments between interest and principal demonstrates further disregard of the terms of the agreement. The November 1, 1976, agreement provides for annual interest payments totaling $285,000 with no payment of principal. Instead, Monterey Pines Investors reported interest deductions of only $233,333 in 1977, of which $225,983 was attributed to the payments totaling $410,929.67. The balance was attributed to principal owed to World Realty.

We note that the discrepancy between the contract terms and the accounting entries of the parties was originally even more disparate. The initial journal entry reflected interest expense of $160,929.67. However, an adjusting journal entry to the books of Monterey Pines Investors made December 31, 1977, credited the Note Payable, World Realty account by an additional $65,053.53 and debited the interest expense account by the same amount, so that the books reflected total interest expense of $225,983.20 for 1977. However, there still remained a $59,016.80 shortfall between the $285,000 required by the agreement and the adjusted figure shown on the books. Needless to say, neither the justification for the adjustment nor the reason for the discrepancy is explained in the record.

Consistent with the disregard shown the November 1, 1976, contract is the concurrent disregard of the October 25, 1976, agreement. According to the October 25, 1976, agreement, World Realty was required to pay Jackson-Harris the amount owed by Jackson-Harris on the October 21, 1976, contract and an amount sufficient to pay off the Bank of America loan. The balance of $300,000 was to be paid in 10 yearly installments with no principal payments until January 1982. Interest was payable at 5 percent for the first 5 years, and at 10 percent, thereafter. In effect, World Realty would step into the shoes of Jackson-Harris in terms of the underlying obligations and also pay Jackson-Harris $300,000 plus interest.

Since the terms of the October 21, 1976, contract called for interest only in the amount of $143,932.80 ($11,994.40 per month) with the balance of $1,635,600 due on or before November 1, 1981, the Jackson-Harris books should have reflected interest income from World Realty in the amount of $175,929 and a reduction in principal of $250,000. The $175,929 interest consists of $143,932 payable to the Gardner Group, $16,997 payable to the Bank of America, and $15,000 payable to Jackson-Harris. The $250,000 principal represents the Bank of America loan.

Instead, Jackson-Harris originally made entries in its books and records reflecting receipt of $217,650.56 interest income from World Realty in 1977, and a reduction of principal due from World Realty of $193,279.11. However, the return filed for Jackson-Harris for 1977 reflects only $114,625 interest income from World Realty, and a reduction in principal

amount due from World Realty of $296,305. As we have already noted, the books and records were changed to comport with the figure stated in the return.

We recognize that merely because the transaction does not constitute a sale, it does not necessarily follow, ipso facto, that the transaction is a sham. *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221 (1981); see *Estate of Franklin v. Commissioner*, 64 T.C. 752 (1975), affd. 544 F.2d 1045 (9th Cir. 1976) (purported sales were not sales but options). Further inquiry must be made to determine whether the transaction was entered into without any economic, commercial, or legal purpose other than the hoped for favorable tax consequences flowing therefrom. 77 T.C. at 1243.

Here, petitioners' lack of interest in (1) verifying that the property was actually being acquired and, if so, at fair market value; (2) protecting their acquired interest by way of title insurance and recordation; (3) asserting control over the subject property; and (4) determining that their interests were being disposed of at a fair price, compels the conclusion that the requisite minimum business purpose is absent.

Petitioners' reliance on *Grodt & McKay Realty, Inc. v. Commissioner, supra*, to support their contention that World Realty actually sold the property to Monterey Pines Investors completely misconstrues the law of that case. As detailed above, the facts analysis of *Grodt & McKay* when applied to the facts and circumstances of this case undermines, rather than supports, petitioners' position.

On brief, petitioners express bewilderment at respondent's refusal to accept the validity of the November 1, 1976, Agreement of Purchase and Sale Land Contract as well as his refusal to accept petitioners' justification for their failure to adhere to the terms therein. Petitioners contend on brief that under California law as it it existed between 1974 and 1975:

The legal community * * * was forced to use the installment land contract because it was the only legally certain protection against losing a low interest loan secured by a trust deed with a due on sale clause.

* * * Any California lawyer would be grossly negligent and incompetent if he did a grant deed rather than an installment land contract.

Petitioners further contend that after executing the alleged land contracts, the unforeseen lis pendens which arose as a

cloud on the title resulting from a lawsuit instituted by G & G Investors against the Gardner Group compelled petitioners to deviate from the terms of the contract.

Again, petitioners' argument lacks logic. First, it is unnecessary that we accept or reject petitioners' representation regarding the validity of the installment sale land contract as a proper mechanism for transferring equitable title to property, since, in any case, the installment sale land contract in question was a sham. Moreover, we fail to see how a subsequent cloud on title would cause petitioners to pay more than the amount required by the terms of the contract. If anything, common sense dictates that an amount less than that required would have been warranted under the circumstances.

In sum, considering the totality of the facts and circumstances surrounding the purported sale transactions, we conclude that petitioners engaged in the expedient of drawing up papers to characterize the transactions in question as something contrary to the economic realities thereof, solely to obtain unallowable tax benefits. What pretended to be a sale was really a loan by the individual petitioners to Harris or his nominee, on which 10-percent annual interest was ultimately paid. Petitioners had no interest in the property, which at all times remained under the dominion and control of Harris. In short, what we have before us is in substance a sham, the expected tax benefits of which will be disregarded.

Since we have held that the Monterey Pines Investors' alleged holding of the property was a sham, there is no basis for holding that the limited partnership was liable under section 1442 for withholding tax on its purported interest payments, which in no event went to World Realty, or for the section 6651(a) addition to tax for the partnership's failure to file Form 1042. The payments were merely the application by Harris of funds which he at all times controlled, without legal significance insofar as this case is concerned.

## Constructive Dividends

Michael and Marilyn Falsetti (the Falsettis) purchased the building, inventory, and equipment of Farnesi's Restaurant. The restaurant was operated as a sole proprietorship from January 1976, until August 3, 1976, when the business was incorporated. The inventory and equipment were transferred

to Mikomar. The Falsettis were the sole shareholders and corporate officers of Mikomar.

During 1977 and 1978, Mikomar paid certain amounts related to auto, boat, travel, insurance, and certain other unidentified expenses. Respondent determined that such payments were personal expenses of the Falsettis and therefore constituted constructive dividends to them. Respondent has assessed the amounts deducted by Mikomar, and the record does not indicate that Mikomar has sought a refund of tax based upon the assessment. Respondent seeks to have the amount paid by Mikomar taxed as constructive dividends to the Falsettis.

The Falsettis concede that the amounts paid by Mikomar pertaining to the Continental Mark V and the Pantera are constructive dividends to them. However, the Falsettis contend that all other expenses at issue were ordinary and necessary business expenses of Mikomar.

The Commissioner's determination in his statutory notice of deficiency is presumptively correct, and the Falsettis, as petitioners, bear the burden of disproving each individual adjustment. Rule 142(a). It is well established that where corporate property is used by a shareholder or member of his family for personal purposes, not proximately related to the corporate business, the corporation is not entitled to deductions to the extent that they relate to such personal use, and the fair rental value of such property is includable in the shareholder's income as constructive dividends to the extent of the corporation's earnings and profits. *Commissioner v. Riss*, 374 F.2d 161, 166–167, 170 (8th Cir. 1967), affg. a Memorandum Opinion of this Court on this issue but revg. and remanding on other issues.[6] Likewise, payments made for the personal benefit of a shareholder by a corporation may constitute constructive dividends. *Challenge Manufacturing Co. v. Commissioner*, 37 T.C. 650, 663 (1962).

The Court of Appeals for the Ninth Circuit, to which an appeal of this case would lie, has enunciated a two-part test for resolution of the constructive dividend issue. That Court has held that the fact that corporate payments are not deductible does not automatically result in constructive dividends to a

---

[6]See also *Whipple Chrysler-Plymouth v. Commissioner*, T.C. Memo. 1972-55.

shareholder. *Palo Alto Town & Country Village, Inc. v. Commissioner*, 565 F.2d 1388, 1391 (9th Cir. 1977). The test for constructive dividends in such circumstances is twofold: not only must the expenses be nondeductible to the corporation, but they must also represent some economic gain or benefit to the shareholder. 565 F.2d at 1391. Thus, where a corporation makes a distribution to a shareholder which serves no legitimate corporate purpose and which results in an economic benefit to the shareholder, such benefit constitutes a constructive dividend to the shareholder to the extent of earnings and profits. *Palo Alto Town & Country Village, Inc. v. Commissioner*, 565 F.2d at 1391; *Commissioner v. Riss*, 374 F.2d at 167. This rule was also applied by the Ninth Circuit in *Meridian Wood Products Co. v. Commissioner*, 725 F.2d 1183, 1191 (9th Cir. 1984).

Often the Court will have before it both the individual shareholder and the corporation so that application of the two-part test is a relatively simple matter. However, Tax Court jurisdiction is dependent upon timely filed petitions by both the individual shareholder and the corporation. Thus, as in this case, application of the Ninth Circuit's constructive dividend rule is complicated when only one of the parties is before the Court, a circumstance beyond our control. Nevertheless, mindful of the Ninth Circuit's mandate that we make specific findings of fact with respect to each element, we proceed as best we can on the record before us.

With respect to the Blazer, we have found that the vehicle was utilized for both business and personal use. Section 162(a) allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." It is incumbent upon petitioners to keep records sufficient to enable the Commissioner to correctly determine the income tax liability. Sec. 6001; see sec. 1.162–17(d)(2), Income Tax Regs. Here, petitioners have failed to keep any records whatsoever pertaining to the alleged business use of the Blazer.

However, where the court is convinced that legitimate business expenses were actually incurred by petitioners, we may, under appropriate circumstances, approximate the amount of expenses petitioners are entitled to. *Cohan v. Commissioner*, 39 F.2d 540 (2d Cir. 1930). We accept petition-

ers' testimony to the extent that a part of the use of the Blazer was for business. Petitioners used the Blazer to pick up wine for the restaurant 1 to 3 times a month from Sangor, California, which is approximately 50 to 60 miles from the restaurant. Petitioners also drove to Fresno, which is approximately 40 miles from the restaurant, to pick up supplies for the restaurant. Moreover, petitioners have conceded that the Lincoln and the Pantera were their personal vehicles, thus lending credence to their testimony that the Blazer was a business vehicle.

On the other hand, the Blazer was also used by petitioners while on vacation to tow boats to various recreational lakes in California and to commute the short distance of 1 mile between home and the restaurant. Taking into account all the facts and circumstances surrounding the use of the Blazer, we hold that 75 percent of the use of the Blazer was for legitimate business purposes. Consequently, 75 percent of the expenses attributable to the Blazer and paid by Mikomar do not constitute constructive dividends to the Falsettis. *Cohan v. Commissioner*, 39 F.2d 540 (2d Cir. 1930).

With respect to the travel and boat expenses, the Falsettis have failed to meet their burden of proof. In order to deduct expenses for travel or entertainment, the Falsettis must meet the strict substantiation requirements of section 274(d). Section 274(d) requires that a taxpayer substantiate by adequate records or sufficient evidence corroborating his own testimony for each deducted item: (1) The amount; (2) the time and place of the travel or entertainment; (3) the business purpose of the expense; and (4) the relationship between the taxpayer and the person entertained.

The Falsettis have failed to meet any of the substantiation requirements of section 274(d) and therefore we agree with respondent that Mikomar would be precluded from claiming any deductions relating to the travel and boat expenses. Since the corporate expenditures were for the personal benefit of the Falsettis, they are taxable on the amount thereof.

During the fiscal year ended October 31, 1977, Mikomar paid premiums totaling $373 on health and life insurance policies in which Michael Falsetti was named as the insured. The Falsettis introduced no evidence to support a claim that the premiums were not for their personal benefit, and we

accordingly sustain respondent's determination that the premiums are taxable to the Falsettis in 1977. Rule 142(a).

Finally, with respect to the unidentified expenses, the Falsettis have failed to establish that the amounts paid by Mikomar had any business purpose whatsoever, or that the payments were not for their benefit. Consequently, respondent's determination that the expenses were not deductible is upheld. Rule 142(a).

To reflect the foregoing,

> *Decisions will be entered for the respondent in docket Nos. 5437-83 and 5438-83.*
> *Decisions will be entered under Rule 155 in docket Nos. 7013-82 and 7111-83.*
> *Decision will be entered for the petitioner in docket No. 20833-83.*