PETER J. BRALLIER, ET AL., 1 Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Brallier v. CommissionerDocket Nos. 12982-82, 13096-82, 21352-83, 21353-83.United States Tax CourtT.C. Memo 1986-42; 1986 Tax Ct. Memo LEXIS 568; 51 T.C.M. (CCH) 382; T.C.M. (RIA) 86042; January 29, 1986. *568 B was the sole shareholder and manager of Nor-Pen, a corporation which owned and operated five Round Table pizza restaurants in San Mateo County, California. Nor-Pen claimed advertising deductions under section 162(a), I.R.C. 1954, in connection with automobile racing performed by B and paid for by Nor-Pen. Held, the racing expenses are allocated between advertising expenses deductible by Nor-Pen and nondeductible expenditures imputed to B as constructive dividends. United States v. Haskel Engineering & Supply Company,380 F.2d 786 (9th Cir. 1967), and Palo Alto Town & Country Village, Inc. v. Commissioner,565 F.2d 1388 (9th Cir. 1977), affg., revg. and remanding T.C. Memo. 1973-223, followed.Held further, amount of allowable miscellaneous business deductions determined. Held further, B is liable for the late filing addition to tax under section 6651(a)(1), I.R.C. 1954, with regard to his 1976 return. Martin A. Schainbaum,Kathleen A. Miller and John D. Garvic, for the petitioners. Alan S. Beinhorn and Paul J. Krug, for the respondent. NIMSMEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: In these consolidated cases, respondent determined the following deficiencies: Peter J. BrallierAddition to TaxCalendar YearIncome TaxSection 6651(a)(1) 21975$35,531.00197649,523.75$9,904.75198049,229,00198141,947.00Nor-Pen Investment Company, Inc.Fiscal Year EndedIncome Tax3-31-75$26,977.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,148.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,750.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,083.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,994.00*571 The issues for decisions are as follows: (1) whether, and to what extent, Nor-Pen Investment Company, Inc. (Nor-Pen) is entitled to deductions for expenses and depreciation relating to automobile racing by its sole shareholder, Peter J. Brallier (Brallier) under sections 162 and 167; (2) whether expenses incurred by Nor-Pen for Brallier's automobile racing constituted constructive dividend income to Brallier; (3) whether the delinquent filing of Brallier's income tax return for the year 1976 was due to reasonable cause and not due to willful neglect; (4) whether payments made on March 31, 1975, totalling $4,730 by Nor-Pen to Brallier's sons and daughters and deducted by Nor-Pen as contract hire on its return for the fiscal year ended March 31, 1975, are ordinary and necessary business expenses deductible under section 162; (5) whether a payments in the amount of $1,100 made by Nor-Pen for rent of a condominium apartment is deductible by Nor-Pen for the fiscal year ended March 31, 1975, as an ordinary and necessary business expense under section 162; and (6) whether the payment of $180 deducted by Nor-Pen on its return for the fiscal year ended March 31, 1975, for telephone expenses*572 incurred in relation to the rental of property from Billings Interiors is an ordinary and necessary expense deductible under section 162. Respondent concedes the deductibility of the payment to Brallier in the amount of $1,950 on behalf of Richard Volante. Brallier, the petitioner in docket number 12982-82, has conceded certain other issues, except for the decrease in rental income. Resolution of this issue is dependent upon the Court's finding with respect to the constructive dividend issue. Nor-Pen, the petitioner in docket number 13096-82, has conceded certain other issues, except for the disallowance of a deduction for a net operating loss carried forward from the fiscal year ended March 31, 1973, to the fiscal year ended March 31, 1976. Resolution of this issue is dependent upon the Court's finding with respect to respondent's determination which increased Nor-Pen's taxable income for intervening years in an amount sufficient to absorb the entire loss. The parties made the following stipulation: Respondent now concedes that for Brallier's calendar years, as set forth below, the amounts asserted as constructive dividends, which amounts were attributable to racing activities, *573 are as follows: 19801981Advertising expense-Racing$30,860.50$ 832.65Rent expense-Racing1,332.001,332.00Wage expense-Racing168.30Insurance expense-RacingTotal$32,360.80$2,164.65We construe the foregoing to mean that respondent is not asserting constructive dividend treatment against Brallier in excess of the amounts stated for 1980 and 1981. The parties also made the following stipulation: The constructive dividend set forth in the notice of deficiency, upon which the case having docket number 12982-82 is based, if respondent prevails is reduced for the years 1975 and 1976 by the same ratio as the amount that total racing expenses have been reduced in the stipulation of facts bears to the total racing expenses set forth in the notice of deficiency. Any adjustment required pursuant to the foregoing stipulation would be made in the Rule 155 computation. Petitioners by stipulation have abandoned a statute of limitations issue raised in certain of their petitions. FINDINGS OF FACT Petitioner Peter J. Brallier (Brallier) resided in Hillsborough, California, at the time he filed his petitions in this case. Petitioner Nor-Pen Investment*574 Company, Inc. (Nor-Pen) had its principal place of business in San Mateo County, California, at the time it filed its petitions in this case. During all of the years at issue, Brallier was president and sole shareholder of Nor-Pen. Nor-Pen during the years at issue was the operator of five franchised Round Table Pizza extablishments located at the following addresses: a. 240 West Third Avenue, San Mateo, CA b. 1207 Burlingame Avenue, Burlingame, CA c. 2 West Hillsdale Blvd., San Mateo, CA d. 1310 West Hillsdale Blvd. (Laurelwood Shopping Center), San Mateo, CA e. 1070 Foster City Blvd. (Marlin Cove Shopping Center), Foster City, CANeither Brallier nor Nor-Pen has ever owned any shares of Round Table Pizza Corporation, Inc. (RTP) or Round Table Franchise Corporation (RTFC). RTFC evolved from a pizza restaurant business founded by William R. Larson in December, 1959. RTFC and its predecessor have been granting Round Table Pizza Restaurant franchises since 1962, in California and in other States. On January 16, 1979, RTP acquired RTFC's business and assets. At that time there were 140 units. At the time of trial there were 392 units located throughout the*575 West and as far east as Iowa, Minnesota and Wisconsin. Nor-Pen signed its first Round Table franchise agreement with RTFC on January 1, 1965. Subsequent agreements were signed on January 27, 1967, and December 9, 1974. The franchise agreements specify that advertising is for the benefit of all franchisees. The average sales volume of RTFC's 140 units in 1979 was approximately $300,000 per year. For the years ast issue, the 392 Round Table units yielded a combined gross revenue in the neighborhood of $160 million. The average sales volume per store per year was approximately $480,000. Nor-Pen has never declared or paid a formal dividend. During the relevant periods, RTFC maintained an advertising trust fund to which certain Round Table franchisees were required, by the terms of their franchise agreements, to contribute. The required contribution from November 30, 1968, to July 1, 1979, was one percent of gross sales. RTFC began signing franchise agreements requiring a three percent contribution to the advertising fund in 1977, but collected only one percent prior to July 1, 1979. An additional two percent was also expected to be spent by the franchisees on local advertising.*576 On July 1, 1979, RTFC began collecting the three percent contribution from those franchisees whose franchise agreements so required. Nor-Pen pays to RTFC three percent of its gross sales as afranchise fee but does not pay into the advertising trust fund. During the years at issue, Nor-Pen's local advertising consisted of newspaper advertising, "couponing", direct mail advertising, door-to-door hangers and sponsorship of local athletic teams. Richard Dumke, the president of RTFC during part of the relevant period, believed that petitioners' racing promotion activity had been of value in promoting and stimulating the name Round Table generally. The following tables reflect the relationship of certain of Nor-Pen's advertising and racing expenditures to gross receipts for the years at issue, together with the amounts Nor-Pen would have been required to contribute to the advertising fund under RTFC's standard franchise agreement: Total Advertising& Racing ExpensesThreeFiscal YearGrossTotal AdvertisingAs A Percent ofPercent ofEndedReceipts& Racing ExpensesGross ReceiptsGross Receipts3-31-75$1,144,807.39$104,073.769.09$34,344.213-31-761,202,374.44108,746.339.0436,071.223-31-771,272,947.7879,143.936.2238,188.443-31-801,751,389.2498,355.955.6252,541.673-31-811,954,089.31106,379.725.4458,622.67*577 Auto RacingTotal RacingExpenditures AsFiscal YearA Percent ofEndedExpendituresDepreciationTotalGross Receipts3-31-75$62,519.31$5,393.00$67,912.315.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,138.715,194.0070,332.715.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,220.002,876.0052,096.004.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,273.5034,273.501.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,901.1126,901.111.38The following table reflects Nor-Pen's auto racing expenditures as a percent of total advertising expenditures for the years at issue: Fiscal YearEndedPercent3-31-7565.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.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.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.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.29Initial monies paid into the advertising trust fund were used by RTFC to create advertising books and materials. The books contained examples of advertisements and were distributed to the franchisees, including Nor-Pen, to aid them in their individual advertising. The advertising guidelines provided by RTFC suggested advertisements reflecting that pizza and sports activities such as football and baseball "go together." Nor-Pen utilized the pizza-and-sports go-together slogan suggested by the RTFC advertising guidelines, but also*578 created "Pizza and Road Racing Go Together." Brallier had an early interest in automobile racing. As a young boy he attended drag races and other forms of automoibile racing. In the early 1960's, Brallier attended road races in Del Monte Forest, Indy car-type races at Sears Point and races in the Laguna Seca area, all in California. In 1972, Brallier took a five-day course in race car driving at the Ontario Motor Speedway. Nor-Pen bought a used 1968 Corvette automobile in 1972 for about $2,500 and paid to have it modified to qualify for competitive racing. However, the engineering on the Corvette was not complete at the time Brallier entered race driving school, where he was required to furnish a racing car for training as a race driver. Nor-Pen therefore purchased a Pantera automobile through Brallier and had it modified for controlled race track driving for use by Brallier at the driver training course. Thereafter, further modifications were made to the Pantera to qualify it for competitive racing. Nor-Pen also purchased a truck on which to transport the race cars because it is illegal to drive race cars on city streets and freeways. The truck was also painted with and prominental*579 displayed Round Table's logo and slogan and Round Table colors. Brallier obtained personal satisfaction and accomplishment from automobile racing, which he found to be "really rewarding." It took his mind off business pressures and gave him a chance to work with his hands. Brallier personally drove the race cars in all of the races in which Nor-Pen race cars were entered, except one. In that race Brallier's co-driver crashed the car before Brallier got in any driving time, so the car, though entered, was not raced. The following schedule shows the locations of races in which petitioners participated during the years in issue, the number of races entered at each location and the distances of such locations from the City of San Mateo, California (mileage to Seattle, Washington, and to Road America is not in the record): FiscalNo. ofDistanceYear EndedLocationRacesFrom San Mateo3-31-75Sears Point555 miles3-31-75Laguna Seca395 miles3-31-75Seattle, WA1826 miles3-31-75Riverside, CA2422 miles3-31-76Sears Point255 miles3-31-76Laguna Seca395 miles3-31-76Riverside, CA1422 miles3-31-76Seattle, WA1826 miles3-31-76Portland, OR1654 miles3-31-76Road America12,175 miles3-31-77Sears Point455 miles3-31-77Laguna Seca395 miles3-31-77Ontario1410 miles3-31-77Road Atlanta12,485 miles3-31-77Portland, OR2654 miles3-31-80Westwood,1839 miles3-31-80British Columbia3-31-80Portland, OR1654 miles3-31-80Laguna Seca195 miles3-31-81Riverside, CA2422 miles3-31-81Laguna Seca195 miles*580 The following schedule shows the location of auto shows in which Nor-Pen's race cars were displayed during the years in issue, the number of auto shows entered at each location and the distance of each such location from San Mateo: FiscalNo. ofDistanceYear EndedLocationShowsFrom San Mateo3-31-76Hillsborough Concourse11.11 miles3-31-76Palo Alto Concourse117.85 miles3-31-76San Mateo Auto Show11.11 miles3-31-77Hillsborough Concourse11.11 miles3-31-80Hillsborough Concourse11.11 miles3-31-81Hillsborough Concourse11.11 milesNor-Pen obtained sponsors for the race cars and displayed their names on the cars, the race car carrier, the driver's uniform and the shirts of the crew and the driver in exchange for the consideration indicated, as follows: Name of SponsorConsiderationUnion OilGasolineGoodyear TireTires and ServiceChampion Spark PlugSpark Plugs and InformationValv-O-LineOilMetcalf Reis LincolnUse of Camper and ServiceAl Leist RacingEngine RepairBudweiserBeerDuring the years in issue, Nor-Pen placed a substantial amount of advertising in The San Mateo*581 Times (the Times), a newspaper which circulates throughout San Mateo County, Nor-Pen's area of operation. Depending upon the size, an individual ad costs from $100 to $500. These ads were placed in the Times through an advertising agency run by Lloyd Johnson, who also wrote a restaurant column called "Bright Lights" for the Times. Johnson made a practice of mentioning Times advertisers in his column, and these included Nor-Pen. Nor-Pen's franchise agreements, as did the agreements of all other Round Table franchisees, contained a provision requiring the franchisees to promote the sale of, and stimulate interest in, pizza products and to favorably promote the name "Round Table Pizza Parlor" and "Round Table Pizza." In general, the restaurant business and particularly the pizza restaurant business, in San Mateo County at least, is highly competitive. Petitioners perceive that people who attend athletic events are people who frequent pizza restaurants, and Nor-Pen's advertising was generally directed at that demographic segment of the population. Petitioners' stores have been consistently successful Round Table franchises and have always been in the top 10 percent*582 of all RTFC franchised stores. During Nor-Pen's fiscal year ended March 31, 1975, Brallier made a series of trips to the "LA country area" where he looked around county by county to determine whether he wanted to transfer a substantial portion of his time and operations there. In this connection Nor-Pen expended $1,100 to rent a condominium apartment on a month-to-month basis. Telephone expenses were incurred in the amount of $180 in connection with Brallier's sojourn. Brallier gave up the idea of expanding his operations to southern California prior to March 31, 1975. Nor-Pen paid the following amounts to Brallier's children during the fiscal year ended March 31, 1975: PayeeAgeAmountMichael17$980Elizabeth161,250Julie151,250Bradley71,200None of the payments to Brallier's children were processed through Nor-Pen's normal payroll, nor were income and FICA taxes withheld. During 1975 Michael was employed by Nor-Pen in an undisclosed capacity. During the fiscal year ended March 31, 1975, Brallier's four children posed for a picture which was subsequently used in some of Nor-Pen's newspaper advertisements. The picture of Brallier's*583 children replaced a picture of three smiling individuals in an advertisement supplied by the Round Table advertisement program. Brallier obtained a three-month automatic extension of time within which to file his 1976 return, which extended the due date to July 15, 1977. The envelope in which Brallier's 1976 return was mailed to the IRS Service Center was postmarked October 14, 1977, and received there on October 18, 1977. Brallier mistakenly thought that he had an extension of time to October 15, 1977, since his California state income tax return was under extension to that date. From October, 1973, to November, 1974, Nor-Pen owned a Cadillac automobile, for which expenses and depreciation were incurred and deducted by Nor-Pen on its tax returns. In November, 1974, Nor-Pen traded in its Cadillac for another Cadillac. From 1976 to the time of trial, Nor-Pen owned a Rolls-Royce four door sedan. OPINION Petitioner Peter J. Brallier (Brallier), during the years in issue, was the sole shareholder and chief executive of petitioner Nor-Pen Investment Co., Inc. (Nor-Pen), a corporation which owned and operated five pizza restaurants under the name "Round Table" in San Mateo County, *584 California. Nor-Pen was a franchisee of Round Table Franchise Corporation (RTFC), itself a subsidiary of Round Table Pizza Corporation, Inc. (RTP). Neither Brallier nor Nor-Pen was a shareholder in either RTFC or RTP. RTFC evolved from a pizza restaurant business founded by William R. Larson in December, 1959. RTFC and its predecessor have been granting Round Table Pizza Restaurant franchises since 1962, in California and in other states. Nor-Pen signed its first Round Table franchise agreement with RTFC on January 1, 1965. Subsequent agreements were signed on January 27, 1967, and December 9, 1974. Each of the agreements required the franchisee to promote and stimulate the name Round Table Pizza. The franchise agreements specified that advertising is for the benefit of all franchisees. Brallier has always been one of Round Table's most successful operators. During the years in issue, Nor-Pen's five restaurants were consistently in the top 10 percent of all RTFC's 392 franchises. RTFC maintained an advertising trust fund to which most of its franchisees were required to contribute. The amount of the required contribution was one percent of gross income until July 1, 1979, and*585 three percent thereafter. Although RTFC management persistently attempted to obtain Brallier's agreement to have Nor-Pen contribute to the advertising trust fund, Brallier just as persistently resisted making such contributions. Brallier prevailed, undoubtedly due to his consistently successful operation of Nor-Pen's franchises. Brallier was not only a highly successful pizza restaurant operator, but he was also a dedicated racing car devotee. As a young boy, he attended drag races and other forms of automobile racing, and later he attended road races in Del Monte Forest, Indy car-type races at Sears Point and races in the Laguna Seca area, all in California. In 1972, Brallier took a five-day course in race car driving at the Ontario Motor Speedway. Brallier obtained personal satisfaction and accomplishment from automobile racing, which he found to be "really rewarding." It took his mind off business pressures and gave him a chance to work with his hands. With one minor exception, Brallier himself drove the race cars in all the races in which Nor-Pen's race cars were entered. At some point Brallier's enthusiasm for automobile racing and his pizza restaurant operations coalesced. *586 Nor-Pen acquired a Corvette and a Pantera, both of which were modified at Nor-Pen's expense for use in automobile racing. Nor-Pen also acquired a truck for transportation of the race cars to and from races, display purposes and the like. The race cars and the truck prominently displayed the Round Table logo, colors, elc. and Nor-Pen built a substantial part of its advertising around car racing. There are several minor issues in this case which will be dealt with in due course. As to the main dispute, i.e., proper categorization of the race car expenditures, it is respondent's position that the costs incurred by Nor-Pen in connection with automobile racing are not ordinary and necessary business expenses of Nor-Pen but are constructive dividends to Brallier. Petitioners counter by saying that the amounts spent by Nor-Pen for its race car activities were initially undertaken and subsequently pursued as an advertising and promotional endeavor for the benefit of Nor-Pen and are therefore deductible as ordinary and necessary business expenses under section 162(a). This being the case, the amounts spent by Nor-Pen are not constructive dividends to Brallier. At one point, in a single*587 sentence on brief, petitioners also assert that if any part of the expenditures are not advertising-promotion expenses, then they are deductible as compensation to Brallier. Since petitioners nowhere else pursue this point, we conclude that it has been abandoned. The burden is upon Nor-Pen to prove that the costs of car racing were ordinary and necessary to its pizza restaurant business and upon Brallier to prove that, to the extent if any that the automobile racing costs were not ordinary and necessary business expenses of Nor-Pen, they were nevertheless not constructive dividends. Deputy v. du Pont,308 U.S. 488 (1940); Rule 142(a). "Ordinary" has been interpreted to mean that the expense should have a reasonably proximate relation to the operation of Nor-Pen's business, Challenge Manufacturing Co. v. Commissioner,37 T.C. 650 (1962), while "necessary" has been interpreted to mean helpful and appropriate in promoting and maintaining the treade or business. Blackmer v. Commissioner,70 F.2d 255 (2d Cir. 1934), revg. a Memorandum Opinion of the Board of Tax Appeals. See Lang Chevrolet Co. v. Commissioner,T.C. Memo. 1967-212.*588 In general, allowable advertising expenses have been held to meet the above tests and therefore qualify as section 162 expenses. Rodgers Dairy Co. v. Commissioner,14 T.C. 66 (1950); see generally Land Chevrolet Co. v. Commissioner,supra.With the above background we take as our texts the following holdings of the Ninth Circuit Court of Appeals (the court to which an appeal in this case would be taken): An expenditure may be, by its nature, ordinary and necessary, but at the same time it may be unreasonable in amount. In such a case only the portion which was reasonable would qualify for a deduction under § 162(a). * * * [United States v. Haskel Engineering & Supply Company,380 F.2d 786, 788-789 (9th Cir. 1967).] and The test for constructive dividends * * * is two-fold; not only must the expenses be non-deductible to the corporation, but they must also represent some economic gain or benefit to the owner-taxpayer. * * * [Palo Alto Town & County Village, Inc. v. Commissioner,565 F.2d 1388, 1391 (9th Cir. 1977), affg., revg. and remanding T.C. Memo. 1973-223; see also Falsetti v. Commissioner,85 T.C. 332, 356-357 (1985).]*589 Petitioners rely heavily upon cases such as Sanitary Farms Dairy, Inc. v. Commissioner,25 T.C. 463 (1955), and Rodgers Dairy Co. v. Commissioner,14 T.C. 66 (1950), for the general proposition that the cost of unconventional forms of advertising--"unique and creative" to use petitioners' terms--may nevertheless be deductible. Sanitary Farms Dairy involved a big game hunt in Africa. Rodgers Dairy involved the exhibition of two Russian wolfhounds and show horses, with color coordinated horse blankets, stable drapes, equipment trucks and the like. But see Kenerly v. Commissioner,T.C. Memo. 1984-117, where we held that a taxpayer's Moorish castle was his home and not a deductible form of advertising. Respondent asserts that petitioners have not provided any substantial evidence to show a causal relationship between Brallier's racing activity and Nor-Pen's pizza sales, relying on cases such as Challenge Manufacturing Co. v. Commissioner,37 T.C. 650 (1962). Applying Haskel Engineering, we conclude that the truth lies somewhere in between the two parties' positions. As revealed through our findings*590 of fact, the record to a certain extent supports petitioners' contention that the racing activities were a legitimate and useful, if somewhat unconventional, form of advertising. The race cars prominently displayed the Round Table colors and logo, and the race car theme was significantly played up in Nor-Pen's overall advertising. Nor do we totally agree with respondent that it is wholly detrimental to petitioners' case that the cars were raced at tracks which were a considerable distance from San Mateo. It must be assumed that race cars must be raced where there are tracks, and it would have appeared absurd for Nor-Pen to display the cars around San Mateo County to promote Nor-Pen's involvement in the sport of auto racing without also being able to display pictures, trophies and the like derived from actual races. Having said that, we also recognize that there was a substantial element of personal satisfaction to Brallier connected with the racing activity. His enthusiasm for auto racing began when he was a young boy and continued unabated into his adult life. As the record before us shows, Nor-Pen bore the substantial costs of the racing activities. Without Nor-Pen, Brallier*591 himself would have had to bear the entire cost of what can only be described as an expensive hobby. The fact that Brallier's hobby coincided with Nor-Pen's advertising would not necessarily be fatal to the deduction of all of the racing expenses were we not convinced that the amounts deducted were excessive in relation to the purpose served. United States v. Haskel Engineering & Supply Company,380 F.2d at 788-789; cf. Lang Chevrolet Co. v. Commissioner,supra. Although Nor-Pen's operations were unquestionably successful, it must be recognized that insofar as that success resulted from advertising, Nor-Pen benefited not only from the racing advertising but also from the general promotion of Round Table by RTFC and its network of 392 franchisees, and from Nor-Pen's own local advertising, also substantial, through media other than car racing, e.g., newspaper ads, couponing, direct mail and the like. While in absolute numbers the amounts spent by Nor-Pen for automobile racing might not strike one as excessive, 3 three countervailing considerations convince us that they are. First, Nor-Pen's racing costs have the characteristics of a national, *592 or at least regional, advertising campaign. To the extent they are not excessive, they benefit all 140 or more RTFC franchisees, not simply Nor-Pen's five franchises in San Mateo County. See discussion, infra. And Nor-Pen expended substantial amounts over and above the racing expenses on purely local advertising, a tacit admission that the racing program alone was inadequate for this purpose. Second, the racing expenses substantially exceeded in three of the five years before us the three percent advertising trust fund contribution which RTFC's management deemed appropriate as a franchisee's contribution to chainwide advertising. Third, as previously discussed, we are persuaded that there was a significant amount of personal gratification to Brallier inherent in the racing activity, not all the expenses of which a company not controlled by him would have incurred. The task before us therefore comes down to a determination of the extent to which Nor-Pen's race car expenditures were incurred primarily to benefit*593 Nor-Pen's trade or business and the extent to which the expenditures were primarily for the benefit of Nor-Pen's sole shareholder, Brallier. Having denigrated to some extent respondents' argument that racing at distant locations invalidates an advertising expense deduction, we must nevertheless recognize that the argument does serve to introduce what we consider to be a significant weakness in petitioners' reliance upon Sanitary Farms Dairy and Rodgers Dairy. In those cases, where we found on facts peculiar to them that the expenditures primarily benefited the business corporate taxpayer, these were the only businesses benefited. That is not the situation before us. While the record does not disclose the number of existing Round Table franchises when Brallier entered into his first franchise agreement in 1965, there were 140 units in January, 1979, and 392 units at the time of trial. We therefore think it fair to assume that in fiscal 1975, 1976 and 1977, the earliest years involved here, there were substantially more than five Round Table units in operation. Nor-Pen's franchise agreements provided, as did the agreements of all other Round Table franchisees, that*594 the franchisees would be required to promote the sale of, and stimulate interest in, pizza products and to favorably promote the name "Round Table Pizza Parlor" and "Round Table Pizza." The franchise agreements specify that advertising is for the benefit of all franchisees. Both past and present RTFC officers testified that Nor-Pen's methods of advertising, including car racing, satisfy Nor-Pen's contractual obligation to stimulate and promote the name Round Table and that such advertising activities were and are beneficial to RTFC. Petitioners themselves assert on brief that their racing promotion activities were a sufficient quid pro quo of advertising effort to satisfy the contractual commitment to promote and stimulate the name Round Table. In addition to the racing expenditures, which benefited RTFC and its franchisees generally, Nor-Pen also spent considerable amounts on strictly local advertising. This included newpaper ads, "couponing", direct mail advertising, door-to-door hangers and sponsoring local athletic teams. We think a fair inference may be drawn from the testimony of the RTFC officers, past and present, who testified at the trial that RTFC accepted Nor-Pen's*595 racing expenses as a reasonable substitute for Nor-Pen's refusal to contribute to the advertising trust fund. Therefore, we consider it appropriate to allocate the racing expenditures between deductible and non-deductible amounts on the same basis as that upon which Nor-Pen would have made contributions to the RTFC advertising trust fund; except, however, we believe a three percent of gross receipts contribution would have been reasonable for the years involved herein. We accordingly hold that Nor-Pen may deduct, as advertising expenses under section 162(a), those race car expenditures in the years at issue which are equal to the lesser of three percent of gross receipts, or racing amounts actually incurred or expended. While it is true that RTFC did not enforce the three percent contribution until July 1, 1979, Larson testified that franchisees were expected to expend an additional two percent of gross receipts on local advertising. Since all advertising by all franchisees was considered to be inter-beneficial to franchisees throughout the RTFC chain, we think there is a sufficient inherent mutual benefit gained from such advertising to permit its deduction. The balance of the*596 racing expenditures in fiscal years 1975, 1976 and 1977, i.e., those in excess of three percent of gross receipts, we hold to be excessive and therefore non-deductible. United States v. Haskel Engineering & Supply Company,380 F.2d at 788-789. The entire amount of racing expenses in fiscal years 1980 and 1981 are deductible by Nor-Pen since they are less than three percent of gross receipts. This leaves the question of whether and to what extent the excess racing expenditures constitute dividends to Brallier. Applying the above-quoted rule of the Ninth Circuit--see Palo Alto Town & Country Village, Inc. v. Commissioner,565 F.2d at 1391--we must determine whether and to what extent the expenditures held excessive under the rationale of Haskel Engineering "also represent some economic gain or benefit to the owner-taxpayer." We observe at this point that no formal dividend has ever been paid by Nor-Pen. As the Palo Alto Town & Country Village rule indicates, disallowed expenses are not automatically taxable to the owner-shareholder. Ashby v. Commissioner,50 T.C. 409 (1968), illustrates an application of this rule. In*597 Ashby, we held that a majority shareholder would not be taxed under the constructive dividend rationale on the entire amount of corporate entertainment expenses disallowed to the corporation for failure to substantiate the expenses under section 274(d). While we recognize that no money or property was directly transferred to Brallier in this case, nevertheless an economic benefit was conferred upon him by Nor-Pen in the form of the racing costs incurred for his, Brallier's, personal benefit. Unlike the situation in Palo Alto Town & Country Village, where "many of the country club expenses were incurred by others than taxpayers," 515 F.2d at 1391, Brallier was the sole beneficiary of the non-deductible racing expenditures incurred by Nor-Pen. There is simply no logical basis upon which a lesser amount could be imputed to him. The regulations provide in section 1.301-1(c), Income Tax Regs., that "[s]ection 301 [relating to taxable corporate distributions] is not applicable to an amount paid by a corporation to a shareholder unless the amount is paid to the shareholder in his capacity as such." Examples of exceptions would be repayment of shareholder loans, *598 compensation for service, payments to shareholder-vendors and rent. See discussion in 3 Bittker, Federal Taxation of Income, Estates and Gifts, par. 92.2, p. 92-13 (1981 ed.). Petitioners have not shown that any comparable exceptions apply here. The parties stipulated that Nor-Pen had sufficient earnings and profits to pay constructive dividends in the amounts set forth in the notice of deficiency (which amounts have been reduced by stipulation (see discussion at p. 4, supra). Furthermore, Brallier has not shown that the benefits conferred upon him by Nor-Pen had a fair market value less than the racing amounts expended by Nor-Pen. See Ashby v. Commissioner,supra, at 418; see also Challenge Manufacturing Co. v. Commissioner,supra.Accordingly, we hold that to the extent the racing expenditures incurred by Nor-Pen and deducted by it under section 162(a) have been found to be excessive, they are taxable to Brallier as constructive dividends. These amounts will, of course, be limited if so required by the stipulation entered into by the parties limiting the amounts of such dividends. Nor-Pen rented an apartment in Beverly Hills, California, *599 for the months of February and March, 1975, at the rate of $550 per month. The apartment was used by Brallier. Nor-Pen deducted $1,100 as rental expense on its return for the fiscal year ended March 31, 1975. Brallier testified that his business purpose in Los Angeles was to study the possibilities of engaging in another venture for Nor-Pen. His testimony on this issue was vague and general. Petitioners offered no documentary evidence to substantiate Nor-Pen's business purpose of this rental expense. Brallier's testimony was totally uncorroborated. In the stipulation of facts, respondent conceded that the amount deducted was in fact expended but did not concede that it was an ordinary and necessary business expense of Nor-Pen. Petitioners have the burden of proving the merits of their claim and of overcoming the presumption of correctness which attaches to respondent's determination. Rule 142(a). In Nelsen v. Commissioner, a Memorandum Opinion of this Court dated March 22, 1948, we made the following observation: We are asked to accept this testimony of an interested witness as proof of payments. Without being supported or corroborated by any other evidence, it is*600 not enough to overcome the presumption that the respondent's determination is prima facie correct. The effect of the testimony of petitioner here is a conclusion, given without any circumstances to gauge its accuracy. See Easton v. Bryant, 19 Fed. (2d) 857; Birnbaum v. Commissioner, 117 Fed. (2d) 395; Hoefle v. Commissioner, 114 Fed. (2d) 713; Hiram C. Wilson,supra [17 B.T.A. 976]. The evidence submitted here goes no further in proving petitioner's case than a signed statement by petitioner in his income tax return or in his claim for refund. * * * We think these comments are equally appliable here. The only documentary evidence submitted in connection with this issue was a "Proposal for Round Table Franchise Corporation Sub-Franchise Agreement," which was offered into evidence by respondent and received by the Court. This proposal was for the development of Round Table Pizza locations in southern California, Arizona and Nevada. Nor-Pen was not a party to this agreement. Rather, the proposal included the formation of a new corporation to be owned by Brallier, William Larson and another individual. Brallier's*601 trip to southern California would be consistent with exploration of this proposal. His testimony that the trip of Los Angeles was no behalf of Nor-Pen rather than on his own behalf lacks credibility in light of the agreement. Expenditures incurred by a corporation on behalf of its sole shreholder are not deductible by the corporation. American Properties Inc. v. Commissioner,28 T.C. 1100 (1957), affd. 262 F.2d 150 (9th Cir. 1958). Respondent disallowed telephone expenses totalling $180 deducted by Nor-Pen on its March 31, 1975, return because petitioners did not establish that these were ordinary and necessary business expenses of Nor-Pen. Respondent's determination bears the presumption of correctness. Rule 142(a). Brallier's unsupported testimony regarding these telephone expenses is insufficient to overcome this presumption of correctness. Brallier testified as follows: Q. Did you also incur $180.00 in telephone expenses from the Los Angeles area during that period of time? A. Yes. Q. And what was the purpose of this telephone expense? A. Well, I mean, the arrangement that I had made with Mrs. Billings was that any phone bill*602 would be in excess of the rental that I paid for the unit, so I owed her the money. Petitioners offered no evidence to show the business purpose of the telephone calls made from the apartment. The deduction is therefore disallowed. During its fiscal year ended March 31, 1975, Nor-Pen made the following payments to Brallier's children: PayeeAgeAmountMichael17$980Elizabeth161,250Julie151,250Bradley71,200Nor-Pen deducted the payments as "bonuses." They were not processed through Nor-Pen's normal payroll nor were income and FICA taxes withheld. Respondent conceded on brief that Brallier's 17-year old son, Michael, worked for Nor-Pen and that Brallier's four children posed for a picture which was subsequently used in some of Nor-Pen's newspaper advertisements. Aside from some generalized testimony by Brallier about "odd jobs", the record is silent as to any actual services which the children might have performed other than posing for the picture. Since respondent concedes that Michael did some work for Nor-Pen, we allow a deduction of $100 for these services plus $100 for posing for the picture. We also allow $100 for each of the*603 other three children for the picture. The Commissioner asserted the late filing addition to tax against Brallier with regard to his 1976 Federal income tax return. Section 7502(a)(1) provides that a return received after the due date shall be deemed filed on the date of the U.S. postmark. However, section 7502(a)(2) provides that: This subsection shall apply only if-- (A) the postmark date falls within the prescribed period or on or before the prescribed date-- (i) for the filing (including any extension granted for such filing) of the return * * * The due date of Brallier's return for the calendar year 1976 was July 15, 1977, as extended under a valid request for an extension of time. The date of the U.S. postmark on the envelope in which that return was mailed, October 14, 1977, did not fall within the prescribed period for filing the return as extended. Therefore, the postmark date is not to be deemed the filing date. See Rev. Rul. 73-133, 1973-1 C.B. 606. The filing date is the date the return was received by the Internal Revenue Service Center, October 18, 1977. That date was three months and a fraction after July 15, 1977, the extended due date. *604 See section 301.6651-1(b)(2), Proced. & Admin. Regs. Brallier's explanation for the late filing of this return is that he had been granted an extension of time to file his state income tax return which extended the due date of that return to October 15, 1977, and he "mistakenly thought both extensions were good until October 15, 1977." Section 6651(a)(1) imposes an addition to tax of five percent per month or fraction thereof for the late filing of an income tax return, "unless it is shown that such failure is due to reasonable cause and not due to willful neglect." Section 301.6651-1(c)(1), Proced. & Admin. Regs., provides the following definition of "reasonable cause": If the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time, then the delay is due to reasonable cause. * * * A mistaken belief as to the correct filing date is not reasonable cause for late filing. American Milk Products Corporation v. United States,41 F.2d 966 (Ct. Cl. 1930); see Board of Trade, Inc. v. Commissioner,T.C. Memo. 1969-58, and Aptitude Associates, Inc. v. Commissioner,T.C. Memo. 1962-281.*605 To reflect the foregoing and various concessions, Decisions will be entered under Rule 155.Footnotes1. Cases of the following petitioners are consolidated herewith: Nor-Pen Investment Co., Inc., docket Nos. 13096-82 and 21352-83; and Peter J. Brallier, docket No. 21353-83.↩2. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954 in effect for the years in issue. All rules references are to the Tax Court Rules of Practice and Procedure.↩3. Petitioners allege that some franchisees spent as much as 10 to 12 percent of gross sales for advertising, whereas Nor-Pen's averaged from 4 to 7 percent.↩