ESTATE OF CLAUDE E. BRIMM, DECEASED, DELORES E. BRIMM, SPECIAL ADMINISTRATOR, AND DELORES E. BRIMM, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; BLESSED RELIGIOUS INSTITUTE OF MERCENARY MISSIONARIES, A CORPORATION SOLE, ACTING FOR AND ON BEHALF OF THE FIRST CHURCH OF GOD THE FATHER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Brimm v. Commissioner
Docket Nos. 5053-71; 9095-74.
United States Tax Court
T.C. Memo 1988-16; 1988 Tax Ct. Memo LEXIS 16; 54 T.C.M. (CCH) 1521; T.C.M. (RIA) 88016; January 11, 1988. Delores E. Brimm, pro se in docket No. 5053-71. James Jess, for the petitioner in docket No. 9095-74. Martin Cohen and Ricardo A. Cadenas, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: These cases were assigned to and heard by Special Trial Judge Daniel J. Dinan, pursuant to the provisions of section 7456(c) of the Internal Revenue Code[1] and Rules 180 and 181, Tax Court *18 Rules of Practice and Procedure.[2] The Court agrees with and adopts his opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE DINAN, Special Trial Judge: In these consolidated cases, the respondent determined the following deficiencies in petitioners' Federal income taxes for the years 1966 and 1967: Docket No.
Year
Deficiency
5053-71
1966
$    533.91
5053-71
1967
26,898.39
9095-74
1967
24,846.74
Respondent having made concessions in docket No. 5053-71, the issues remaining for decision are (1) whether, in docket No. 5053-71, petitioners must include in their income, under section 61, the amounts of $ 2,382.37 and $ 65,305.71 earned by Concept Development in 1966 and 1967, respectively, (2) whether, in the alternative, respondent abused his discretion under section 482 in reallocating Concept's income in 1966 and 1967 to petitioners, (3) whether petitioner, in docket No. 9095-74, was exempt from tax *19 in 1967 under sections 501(a) and 501(c)(3), (4) whether, in docket No. 5053-71, petitioners received unreported interest income in 1967 in the amount of $ 328.06, and (5) whether petitioners, in docket No. 5053-71, may claim their daughter, Claudia, as an exemption in 1967. FINDINGS OF FACT Some of the facts in these consolidated cases have been stipulated and are found accordingly. The stipulations of fact and exhibits attached to them are incorporated herein by this reference. Claude and Delores Brimm, petitioners in docket No. 5053-71, were husband wife residing at 6862 Vanscoy Avenue, North Hollywood, California, when they filed their petition. Petitioner Claude E. Brimm (Claude) died October 24, 1976. Petitioner Delores Brimm (Delores) was appointed special administrator for the Estate of Claude E. Brimm. Petitioners filed joint returns in 1966 and 1967. Claude and Delores had two daughters, Claudia and Nancy, who lived at home during the years in issue. In July 1967, Claudia, then 19, was married to William Haas. Claudia's husband was in the United States Army. One month after they were married, Haas was sent to Vietnam. Claudia worked as a secretary and bookkeeper *20 in Claude's office and also attended Valley State College during 1967. The Blessed Religious Institute of Mercenary Missionaries (Institute), petitioner in docket No. 9095-74, was a corporation sole organized under the laws of the State of California. In 1964, Claude incorporated Institute in Los Angeles County. At the time when the petition was filed, Institute was still located in Los Angeles County in California. Although it was not listed on the marquee in the lobby of the building, Institute used office space at 12160 Victory Boulevard. Under its articles of incorporation, Institute's stated purpose was to engage in the specific business of administering and maintaining the affairs and property of the organization and to exercise all the powers of a corporation sole as outlined in Division (2), Part (2) section 10007 of the California Corporations Code (West 1977) in furtherance of its purpose. Section 10002 of the California Corporations Code (West 1977) provides that a "corporation sole may be formed by the bishop, chief priest, presiding elder, or other presiding officer of any *21 religious denomination, society, or church, for the purpose of administering and managing the affairs, property and temporalities of the corporation." Claude was the director and presiding bishop of Institute. On or about August 18, 1964, Institute filed an application for Federal income tax exemption with the District Director of the Internal Revenue Service in Los Angeles. Institute sought tax exempt status under section 501(a). In its application, Institute stated that its purpose was "spreading the word and acts of God in such manner as to create goodwill, brotherhood and religious understanding and tolerance among all men. Further, to aid the sick, afflicted, infirm, aged, injured or destitute with whatever facilities are at the organization's disposal." A similar application was made in March, 1967. The IRS issued Institute a determination letter dated May 16, 1967, amended by a second letter dated June 14, 1967. The letters granted Institute tax exempt status. In January of 1966, Claude was operating a sole proprietorship under the name of Concept Development (Concept). The only business of Concept was to provide the personal engineering services of Claude to various *22 enterprises. On May 11, 1966, Institute filed a certificate of corporation for the transaction of business with the County Clerk of Los Angeles under the name Concept Development. The certificate was signed by Claude as director of Institute. Claude signed a document dated September 23, 1966. which purported to transfer his and Delores' interest in Concept to Institute. The document stated that the transfer was to be effective on October 1, 1966. Before and after the transfer, Concept's offices were at 12160 Victory Boulevard. The office space was leased by Claude d/b/a Concept. After October 1, 1966, Concept employed a number of subcontractors who were engineers and computer programmers, to fulfill employment contracts which Concept had negotiated with various aerospace firms in the Los Angeles area. To find available positions, Claude contacted his personal acquaintances to determine when a particular aerospace firm needed engineers to work on a project. Concept then placed one of its subcontractors with the aerospace firm. The subcontractors had learned of Concept either through advertising or word of mouth. The aerospace firm would then pay Concept an hourly wage *23 for the services performed by the subcontractor and Concept would retain a commission on that amount ranging between 15 percent and 20 percent. The remainder was paid to the subcontractor. Concept also provided on-the-job training programs for three handicapped individuals. These individuals were referrals to Concept by the California Department of Rehabilitation. They were temporarily placed with aerospace firms. Not one of the three was given full-time employment after the training programs ended. A fourth person was referred to Concept by the Department of Rehabilitation but Concept was unable to place him. After these four referrals failed to receive full-time employment, the Department of Rehabilitation ended its association with Concept. To help manage the income from the expanding business of Concept, Claude arranged a factor agreement with Atlas Factor Division of United California Bank (Atlas). The factor agreement was signed on November 22, 1966. The agreement was signed by Claude d/b/a Concept Development. In connection with the factor agreement the bank required two things. The first was that Claude was required to register with California as doing business *24 under the fictitious name of Concept Development. The registration document was executed by Claude and filed by him on the same day on which the factor agreement was signed. Atlas also required Concept to maintain an account with United California Bank. To protect against uncollectible accounts, Atlas required Claude to maintain a balance in the account of 20 percent of the Concept bills which were outstanding. As the Concept bills were collected, Atlas transferred funds to a second account which was maintained in the name of Concept. The signatories for the second account, #2139111616, were Claude, Delores, and Claudia. Claude maintained other bank accounts including a savings account #D19117 at Los Angeles Federal Savings and two accounts, savings accounts #300-294205 and #30016-3395, at Union Bank. The account with Los Angeles Federal Savings was originally opened in Claude's name. On July 7, 1967, the name on the account was changed to the Blessed Religious Institute of Mercenary Missionaries. The authorized signatories on each of the signature cards of these three accounts were Claude, Delores and Claudia. In 1967, interest on these accounts totaled $ 328.06. All the *25 accounts were managed by Claudia who on November 29, 1967, withdrew $ 14,910.85 in the form of a cashiers check from the United California Bank. In 1967 Atlas factored $ 305,084.56 of Concept's billings. Of the $ 305,084.56 factored, $ 237,965.87 was deposited in the United California Bank. Claude did not draw a salary from Concept. However, he did receive a parsonage allowance which he paid for his car expenses, his housing, telephone and maintenance of the house. During January of 1967 Institute established a scholarship fund. Payments in 1967 were made to 13 people and totaled $ 29,376.51. The Brimms received $ 14,784.02 of the scholarship fund. In connection with this educational activity Institute founded Los Angeles University on March 8, 1967. While trying to meet the State of California's requirement for a licensed university, Claude allowed a number of personal assets to be used to prove that the university had $ 50,000 worth of assets devoted to educational activities. Those assets included a Bank of America checking account belonging to Delores, the Los Angeles Federal Savings account, the Union Bank savings accounts, the United California Bank account, the reserve *26 account at United California Bank, the Atlas factoring account, four automobiles, the fixtures at the offices at 12160 Victory Boulevard, the fixtures at the Brimms' household at 16408 San Fernando Mission Boulevard, and real estate in the State of Washington owned by Delores. In 1967, the school had no facilities other than the office on Victory Boulevard and had no faculty. The books of account of Institute and Concept were audited in 1968 by Mr. Jerry Koester of the Internal Revenue Service. The purpose of the audit was to discover if the Institute deserved its tax exempt status. As a result of the audit it was determined that the Brimms had underreported their income because they had not included amounts earned as income form Concept on their 1966 and 1967 Federal income tax returns. At a preliminary meeting on November 4, 1968, George Foster of the Internal Revenue Service suggested that written evidence of a sale of Concept to Institute would be helpful in the disposition of the 1966 and 1967 disputed items. Claude did not produce any of the documents requested. A statutory notice of deficiency was therefore issued determining deficiencies of $ 533.91 and $ 26,898.39 in *27 the Brimms' Federal income taxes for the years 1966 and 1967, respectively. In 1972, Institute convened a meeting of its council of bishops at which the bishops ratified a document allegedly transferring the business of Concept to Institute dated September 23, 1966. The terms of the sale provided that Institute would pay Claude an amount equal to 25 times the 1967 net income earned by Concept. The sale required no payments for at least ten years and full payment by 1989. In exchange, Claude gave Institute all the "fixtures, equipment, stock-in-trade, inventory and goodwill" of Concept. The sales agreement was dated January 1, 1967. In 1972, the sales agreement of January 1, 1967, was ratified by the Bishop's Council. In 1974 Claude instituted proceedings in a California state court to obtain a declaratory judgment validating the transfer of September 23, 1966, and declaring the sale document of January 1, 1967, to be bona fide. After the Attorney General's office sought to be joined as a party, Claude withdrew the action. In 1969, the Internal Revenue Service decided to revoke Institute's tax exempt status and informed Institute of that fact by letter dated April 7, 1969. *28 After a district conference, a letter of revocation was issued on November 28, 1972. Institute was required to file an income tax return for 1967. On February 15, 1973, Institute filed a return for 1966 which reflected taxable income of $ 1,617.00. OPINION Because Institute, Concept and Claude are all so closely intertwined, we must first set forth the relationship between them. Claude in the central character in this scenario. In 1964 he established the First Church of God the Father and incorporated Institute to carry out the temporalities of the Church. He acted as the presiding bishop of Institute, which, during 1966 and 1967, gave Claudia complete control over Institute's activities. In 1966, Claude established Concept. Originally, Claude was the only employee of Concept. He created all the goodwill of Concept through his personal services and established contacts with members of the aerospace industry. In 1966, he was acting both for himself, d/b/a Concept and for Institute, when he allegedly transferred Concept to Institute. He thereafter conducted the business affairs of Concept as the presiding bishop of Institute. The underlying business of Concept did not *29 change in essence. Concept still provided engineering services to the aerospace industry and others and Claude still maintained his personal contacts within the aerospace industry. The only change in Claude's method of operation was that he now hired other people to provide the actual engineering services previously provided by him. Delores testified that after the transfer, Concept was just an expanded version of Concept as it was before the transfer. Nothing had changed but the names. Claude was still in charge of Concept but operated as the presiding bishop of Institute. With that in mind, we must first decide who amongst Claude, Concept and Institute earned the income in 1966 and 1976. Respondent contends that because Claude was in control of Concept and Institute and was himself in the trade or business of being an engineer, section 482 should be applied to reallocate income between Concept and Claude. However, we find that applying section 482 would imply a substance to Claude's various machinations which did not exist. The facts show that it would be virtually impossible to reallocate the income from Concept to Claude because they are one and the same for tax purposes. *30 [3] We find that Claude's transfer of Concept to Institute was a sham involving paper transactions which had no substance. [4]
*31 In Falsetti v. Commissioner,85 T.C. 332 (1985), we defined a "sham in substance" as the expedient of drawing up papers to characterize transactions contrary to objective economic realities and which have no economic significance beyond expected tax benefits." 85 T.C. 332, 347 (1985). In a sale transaction we must determine whether the parties have in fact done what the form of their arrangements purports to do. Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1237 (1981). In deciding whether a particular transaction is a sale we must decide who bears the burdens and benefits of ownership. Various factors which have been considered in making this determination were summarized in Grodt & McKay Realty, supra at 1237-38. The relevant factors in this instance are how the parties treat the transaction, whether there is a present obligation for the purchaser to make payments, and which party receives the profits from the operation and sale of the property. An additional factor considered by the court in Falsetti v. Commissioner, supra at 348 *32 is the presence or absence of an arm's-length transaction. Claude never relinquished his rights of ownership over Concept. Before the alleged transfer of Concept to Institute, Claude had all the benefits and burdens of ownership. The only change after the alleged transfer was the name under which Claude operated. In the first part of 1966, Concept was Claude's sole proprietorship. For tax purposes a sole proprietorship is the same as the individual taxpayer. On September 23, 1966, Claude signed a document purportedly transferring Concept to Institute effective October 1, 1966. After that time Claude continued to run Concept as he previously did. Claude personally made contact with aerospace firms and personally contracted with the firms to provide them with temporary employment. The evidence at trial showed that the majority of the aerospace firms dealing with Claude did not know that Concept had been transferred to a religious organization known as Institute. The contracts and communications between the aerospace firms and Concept failed to mention Concept's affiliation with Institute. Even if a client had visited the offices of Concept, there was very little indication *33 that Concept was affiliated with any religious organization. Institute was not listed on the building marquee along with Concept. Once inside the offices, a client would not have know as Institute. Even the lease for the office space was signed by Claude d/b/a Concept. In addition, United California Bank (United) believed that Claude was the only owner of Concept. Claude signed all the contracts for the factor agreement as Claude Brimm d/b/a Concept Development. Mr Zweben, Atlas' agent, testified that he was aware that he was dealing with Institute. His testimony is of little significance since he was the only one at the bank who was allegedly aware of an organization known as Institute. Any other member of the bank looking at the factor papers would have believed that United was doing business with Concept because all the papers were signed by Claude d/b/a Concept. Furthermore, the manner in which the receipts collected by Atlas were treated would not have alerted United to the fact that Concept had been replaced by Institute. The Brimms and Claudia were the signatories on the United accounts and they withdrew money at will. Claudia, the bookkeeper for Concept, withdrew *34 over $ 14,000 by a cashier's check dated November 29, 1967. Petitioners were unable to explain this withdrawal but the check was endorsed to Union Bank, for deposit only. By coincidence, the Brimms had an account at Union Bank which was in their names only. This control over and commingling of funds would lead United to the conclusion that Concept's funds were Claude's personal funds. Therefore, Concept's clients and United had every reason to believe that Concept was Claude's personal business. All the outward appearances of Concept indicated that Claude was in control. Another indication that Claude did not treat Concept as having been transferred to Institute was that Concept's receipts were used to create a scholarship fund which directly benefited Claude. In 1967, Institute, using funds from Concept, granted thirteen scholarships. [5] The total amount of scholarships was $ 29,376.51 of which the Brimm family received $ 14,784.02. Delores testified that the sole person making the decisions as to who received a scholarship was Claude. There were no clear standards about who would receive a scholarship. This "failure to develop criteria of grants or to keep adequate records *35 of each recipient can result in abuse." Church in Boston v. Commissioner,71 T.C. 102, 107 (1978). Petitioners have failed to show that there was no abuse and therefore we find that the fund was used for personal reasons. Claude was using the funds of a company which he had supposedly transferred to Institute for personal purposes. In connection with the scholarships, Claude and Institute created Los Angeles University. In 1967, the University did not have any faculty or facilities other than an office on Victory Boulevard. While applying for certification, Claude listed Institute's alleged assets to meet a California requirement that at least $ 50,000 worth of assets be dedicated to educational purposes. Claude's list of assets included Concept's bank accounts, the Brimms' bank accounts, and Delores' real estate in Washington. Even Claude had a difficult time keeping his assets and Concept's assets separate. The last point that indicates that Claude did not treat *36 Concept as being transferred to Institute is that a substantial portion of the Brimms' living expenses were paid out of Concept's accounts. Claude had four automobiles in his name. Operation and maintenance expenses on the cars for 1967 were $ 2,081.27, which was paid by Concept. The Brimms' telephone bills were paid by Concept. Housing was also provided. Concept paid the $ 175 a month rent on the Brimms' home. Petitioners claim that this was a normal parsonage allowance but all these expenses were paid from Concept's bank accounts. It is common for an owner of a sole proprietorship to withdraw funds from the company accounts to pay personal bills. Therefore, Claude, commingling all of his funds in Concept's account and paying personal expenses, was treating Concept like it was his own sole proprietorship. Petitioners' reliance on Rittenhouse v. Commissioner,T.C. Memo. 1965-245, is misplaced. Petitioners rely on Rittenhouse to indicate that it is not improper for a church to maintain its property in the name of its ministers. However, in Rittenhouse the church's interest in a mill was known throughout the community and the expected profits were *37 to be dedicated to maintaining the church. Here the connection between the property and Institute was not nearly as open. Only members of the Institute's inner circle were aware that Concept was allegedly transferred to Institute. The second factor showing that there was not a sale is that there was not a present obligation for Institute to pay for the transfer of Concept. The terms of the agreement were that Institute would pay Claude 25 times Concept's net earnings in 1967. The first payment was not due for 10 years and the entire payment could be deferred until 1989. This indicates two things. First, Claude was bearing all the risks of ownership of Concept in 1967. If Concept failed to make a profit then Claude would not receive any payment for the transfer of Concept to Institute. Therefore, Claude had ample motivation to dedicate a substantial portion of his time to the operation of Concept. Second, Claude was trying to defer his income from 1967 to 1989. His earnings were going to be the source of his payment in 1989. If he did not continue to work at Concept there would probably not be sufficient funds to make the final payments. This relates directly to the third *38 factor, i.e., who is going to receive the profits from the operation of the property. Claude was likely to receive the majority of Concept's profits from 1967 to 1989 in one lump sum payment in 1989 because Concept's profits were Institute's only source of revenue with which to pay the obligation. The last factor which we looked at in Falsetti was the arm's-length nature of the transaction. Nothing done between Claude, Concept, and Institute was at arm's length. Claude represented both sides of the transaction in every instance. First, Claude was doing business as Concept. Then, on May 11, 1966, he signed a fictitious name registration for Institute d/b/a Concept. Next, he transferred Concept to Institute for an amount to be determined at a later date. Finally, he signed a sales agreement between Concept and Institute. He signed it both as the owner of Concept and the presiding bishop of Institute. If the transaction had been at arm's length Institute would never have signed the sales agreement with Claude. Institute was in a very strong bargaining position. If this had been an arm's-length transaction Institute would have agreed to the unfavorable terms set out in *39 the sales agreement. Furthermore, it is apparent that the sales agreement, dated January 1, 1967, was an afterthought. The testimony at trial by petitioners' witnesses about the sales agreement was unconvincing. Bishop Mars testified that the sales agreement was signed on December 18, 1966. Bishop Ledesma testified it was signed in December sometime before Christmas. However, neither one could adequately explain why the agreement was dated January 1, 1967. Nor could they explain why there were no signatures of witnesses even though there were 12 to 15 people present at the time the agreement was supposedly signed. Bishop Ledesma testified that the reason no one witnessed the agreement was that there was no one in the group who was legally sophisticated. However, in light of Claude's experience in establishing the corporation sole, signing the Atlas factor agreement, and his later dealings with various regulatory agencies, it is apparent that, while he was not an attorney, he was sophisticated in legal matters. The evidence shows that in 1968, the Internal Revenue Service provided Claude with an opportunity to produce any documents supporting the sale of Concept to Institute. *40 At that time he declined to produce any documents. The first time the sales agreement was seen by someone outside Institute's inner circle was in 1972 when the agreement was finally given to the Internal Revenue Service. Shortly before the sales agreement was shown to the Internal Revenue Service, Claude apparently felt that its validity was questionable and therefore Claude had it ratified by Institute's Council of Bishops. In 1974, Claude made a further attempt to establish the validity of the sales agreement. Claude brought a suit in a California state court for declaratory judgment against Institute. Claude argued that there was a real controversy between the parties about the validity of sales agreement. As presiding bishop of Institute, Claude decided to contest the issue and yet admitted every allegation of his own complaint. When the Attorney General of California tried to be joined in the case, Claude withdrew the action. It appears that Claude wanted to be the only one, acting on behalf of himself and Institute, to argue both sides of the issue. He wanted the Court to affirm the arms-length nature of the agreement but could not afford close scrutiny of the alleged *41 transaction. We, therefore, find that in fact the sales agreement was not signed in 1966 or 1967. Another indication that Claude and Concept were not dealing at arms-length is the fact that Claude was not paid a salary by Concept. Petitioners contend that Claude did not receive a salary because he was merely carrying out the duties of the presiding bishop. Petitioners argue that Concept was an extension of Institute because Concept was helping people maintain their dignity by being employed. However, petitioners' arguments are not convincing in light of the highly qualified personnel that Concept employed and the commercial manner in which Concept was run. Claude was the key employee for finding and communicating with aerospace firms and for arranging the factor agreement with was highly commercial in nature. A small salary for a key employee is evidence that a transaction was not at arm's length. We therefore find that Claude was not dealing with Institute and Concept at arm's length and had sufficient control over the transaction to impress whatever form he desired upon the combination of Concept with Institute. Because Claude continued to treat Concept as a sole proprietorship *42 and because the alleged transfer of Concept to Institute was not negotiated at arm's length, we find that Claude created a mere paper transaction. However, finding that the sale was a paper transaction is not sufficient to determine that Claude's transaction was a sham. We must also find that the "transaction was entered into without any economic, commercial, or legal purpose." Falsetti v. Commissioner, supra at 354. We must make our determination on the facts as they existed in 1966 and must do so without the advantage of hindsight. The facts presented at trial show that the economic substance of the alleged transfer of Concept to Institute was so nebulous that it could not have been a motivating factor. First, the sales agreement did not guarantee Claude any payment. The purchase price was "twenty-five times the 1967 net income." The sales agreement does not state whose net income nor does it define the term net income. Furthermore, the payment schedule was not established except for the provision that payments would not begin for 10 years and would be paid in full by 1989 without interest. By writing the sales agreement, Claude was merely establishing an *43 opportunity to receive a lump-sum payment sometime in the future, if he needed cash. Even if the sales agreement had established binding terms on the parties, Claude could not have believed that he would ever actually receive payments. Institute could not have been expected to be able to pay Concept 25 times $ 65,000 (Concept's approximate net income in 1967) in 1989. Institute did not have any source of income other than from Concept's activities and negligible contributions from Church members. This income stream could hardly have been expected to cover the large payments that were required by the sales agreement. This is especially true in light of the fact that in 1967 Institute expended all but $ 1,200 of Concept's income on scholarships, a reserve account, and the parsonage allowance for petitioners. Another factor in our determination that there was no economic purpose for the transfer of Concept to Institute was that Claude was solely responsible for any income earned by Concept in 1967. Although Concept used others to staff various aerospace firms, it was Claude who made most of the efforts to acquire employment contracts and it was he who signed the contracts. *44 [6]Claude could either make or break Concept through his personal efforts. He could also make or break Concept through his management of Concept's books. He therefore had the ability to determine the purchase price of Concept by either increasing or decreasing Concept's profits as he pleased. Generally, the seller does not have the discretionary power to unilaterally determine the selling price of his business. Therefore, when the sales agreement was signed, Claude did not have a realistic expectation of being paid for Concept. He was merely establishing a method to defer his income to a future unspecified date. *45 Because we find that all of Concept's income is includable in Claude's income, Institute had no income for 1967 and the issues raised in docket No. 9095-74 are moot. We do not need to decide whether Institute is exempt from taxation under section 501(a) and 501(c) (3) for 1967 because Institute had no income from Concept for that year. We therefore find for petitioner in docket No. 9095-74. The next issue we must decide is whether the Brimms had unreported interest income in 1967. The respondent determined that they received $ 328.06 from Union Bank and Los Angeles Federal Savings and Loan. The Union Bank accounts were held in the Brimms' names for 1967. The Los Angeles Federal Bank account was held in Claude's name until July 7, 1967, when the name on the account was changed to Institute. Petitioners contend that the interest income belonged to Institute because the accounts were in fact Institute's even though they were in the Brimms' names. As we have already held, the substance of the transaction is controlling. Claude treated the accounts as if he was the owner. He had the accounts in his name. The change of the name on the Los Angeles Federal account had no effect. *46 Claude did not give up control of the account. He merely changed the name to avoid tax on his interest income. Therefore, we find for the respondent on this issue. The final issue we must decide is whether Claude and Delores may claim their daughter Claudia as a dependent in 1967. Petitioners contend that they may claim an exemption for Claudia because Claudia fits within the definition of a student in section 151(e)(1)(B) and 151(e)(4). In 1967 Claudia was residing at 16408 San Fernando Mission Boulevard, Granada Hills, California, with her parents. In July 1967 Claudia was married. Her husband was in the United States Army. Thirty days after they were married Claudia's husband was sent to Vietnam. Claudia continued to live at home with her parents. While living in her parents' home Claudia attended Valley State College. For the tax year 1967 Claudia signed and filed a joint return with her husband. The sole purpose of this return was to obtain a refund.
Section 151(e) sets out certain of the requirements for a taxpayer to claim an exemption for a dependent. Section 151(e) *47 provides: (1) An exemption of $ 600 for each dependent (as defined in section 152) -- (A) whose gross income for the calendar year in which the taxable year of the taxpayer begins is less than $ 600, or (B) who is a child of the taxpayer and who (i) has not attained the age of 19 at the close of the calendar year in which the taxable year of the taxpayer begins or (ii) is a student. (2) No exemption shall be allowed under this subsection for any dependent who has made a joint return with his spouse under section 6013 for the taxable year beginning in the calendar year in which the taxable year of the taxpayer begins. * * * (4) For purposes of paragraph (1)(B)(ii), the term "student" means an individual who during each of 5 calendar months during the calendar year in which the taxable year of the taxpayer begins -- (A) is a full-time student at an educational institution; or * * *
Respondent, in his statutory notice of deficiency contends that Claudia had over $ 600 gross income and was not a "student" in 1967. Therefore he argues that Claudia could not be claimed as a dependent by petitioners in 1967. [7] Respondent determined that Claudia's husband had over *48 $ 1,200 of income from his service in the Army. Under California community property law, all income earned during the marriage is divided evenly between the spouses. Community property is gross "income from whatever source derived." Hahn v. Commissioner,30 T.C. 195, 198 (1958), affd. 271 F.2d 739 (5th Cir. 1959). Therefore, the respondent concludes, Claudia must have over $ 600 in gross income. The Commissioner's determinations are presumed to be correct. The taxpayer bears the burden of proving them incorrect. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Petitioner have failed to put forth any evidence concerning the income of Claudia's husband. Furthermore, petitioners' evidence at trial failed to overcome the Commissioner's determination that Claudia was not a qualified student. Section 151(e)(1)(B) provides two alternatives for avoiding the gross income requirement for dependency exemption purposes. Either the child has to be under *49 19 or a student. A student is defined as a person who is a full-time student at an educational institution for at least 5 calendar months during the taxable year. In 1967 Claudia turned 19. The only testimony that Claudia was a full-time student came from Delores and her testimony was contradictory. We, therefore, find that petitioners have not overcome their burden and find for respondent on this issue. Claude and Delores may not claim Claudia as a dependent in 1967. Decision will be entered under Rule 155 in docket No. 5053-71.
Decision will be entered for petitioner in docket No. 9095-74.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for 1966 and 1967, unless otherwise indicated. ↩
2. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
3. Petitioner contends that the stipulations prevent the respondent from arguing that the transfer of Concept to Institute did not occur. The stipulation states that Claude transferred Concept to Institute effective October 1, 1966. However, stipulations that are erroneous as contrary to the facts or the law are not binding on this Court. Gulf Oil Corp. v. Commissioner,87 T.C. 135↩ (1986). We find that the stipulation is contrary to the facts developed on the record and therefore disregard the stipulation. Here, petitioners did not treat the transaction as a sale. 4. Because we find that the transfer was a sham, we are not required to decide if Institute was a corporation formed for tax purposes. The validity of Institute's religious tenets was not an issue at trial. Furthermore, we are not pursuaded that Ach v. Commissioner,42 T.C. 114 (1964), affd. 358 F.2d (6th Cir. 1966), cert. denied 385 U.S. 899 (1966), requires us to apply section 482 because in Ach↩ there were two pre-existing businesses and the transfer was made for a substantial cash payment. The existence of the transfer was never questioned. 5. The evidence at trial indicates that 17 recipients received scholarships but the worksheets used to determine the number of scholarships show that several names were repeated on the list. ↩
6. We are not convinced by petitioners' arguments that Claude devoted the majority of his time to his duties as presiding bishop of Institute. Petitioners argued that Claude's activities for Concept were his duties as presiding bishop because it was one of the tenets of the Church that everyone be employed. This was merely an attempt by petitioners to cloak Concept's consulting business with the mantle of the Church. Highly trained and qualified individuals were employed by Concept to fulfill its contracts. Concept did not provide opportunities for the chronically unemployed. Therefore, Claude was primarily managing a consulting business and employment agency, not acting as bishop. This "aspect of petitioner's service is not inherently charitable, educational, or scientific." B.S.W. Group v. Commissioner,70 T.C. 352, 359↩ (1978) (research consulting firm). 7. Petitioners contend that Claudia may be claimed as a dependent because her husband was serving in Vietnam and, therefore, the fact that Claudia filed a joint return does not prevent her from being claimed as a dependent. Respondent conceded this issue on brief. See Rev. Rul. 65-34, 1965-1 C.B. 86↩, in which respondent ruled that an otherwise allowable dependency exemption will not be disallowed if a joint return is filed solely in order to claim a refund. Because the arguments above are controlling it is not necessary to consider this issue.